[Cite as *State v. Singh*, 2022-Ohio-3385.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-12-158 |
| | : | O P I N I O N |
| - vs - | | 9/26/2022 |
| | : | |
| TARANPREET SINGH, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2021-02-0242

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Michael K. Allen & Associates, and Michael K. Allen and Bryan R. Perkins, for appellant.

**HENDRICKSON, J.**

{¶1}   Appellant, Taranpreet Singh, appeals from his conviction and sentence in the Butler County Court of Common Pleas for rape, kidnapping, and assault.  For the reasons set forth below, we affirm appellant's conviction and sentence.

**I. FACTS & PROCEDURAL HISTORY**

{¶2}   On March 26, 2021, a superseding indictment was filed charging appellant

with eleven criminal offenses involving four different victims.[1]  Counts one through four of the indictment charged appellant with rape in violation of R.C. 2907.02(A)(2), kidnapping in violation of R.C. 2905.01(A)(3), kidnapping in violation of R.C. 2905.01(A)(4), all felonies of the first degree, and assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree, as it related to events that occurred on September 4, 2019, through September 5, 2019, involving "Jane."[2]  Counts five and six charged appellant with rape in violation of R.C. 2907.02(A)(2) and kidnapping in violation of R.C. 2905.01(A)(4), felonies of the first degree, as it related to events that occurred on April 2, 2020, involving "Daisy."  Counts seven through ten charged appellant with rape in violation of R.C. 2907.02(A)(2), kidnapping in violation of R.C. 2905.01(A)(3), kidnapping in violation of R.C. 2905.01(A)(4), and aggravated robbery with a deadly weapon in violation of R.C. 2911.01(A)(1), all felonies of the first degree, as it related to events that occurred on August 23, 2020, involving "Marie." Counts seven through ten were all accompanied by a firearm specification under R.C. 2941.145.  Finally, count eleven charged appellant with rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, as it related to an event that occurred between September 1, 2019, and September 30, 2019, involving "Amy."

{¶3}  Appellant pled not guilty to the charges.  On September 27, 2021, the day before a four-day jury trial commenced, the state dismissed count eleven.  Regarding the remaining charges, the state presented testimony from Jane, Jane's mother, Daisy, Marie, the sexual assault nurse examiners ("SANE nurses") who administered rape kits for the three alleged victims, detectives and officers from the city of Hamilton and city of Middletown police departments who investigated the charged offenses, and a Bureau of Criminal

---

1. Appellant was initially indicted on nine felony offenses on February 25, 2021.  The superseding indictment added two additional offenses.

2. For privacy and readability, we refer to the victims using fictitious names.

Investigation (BCI) forensic scientist who tested and analyzed DNA evidence obtained from the administration of the rape kits. Through his defense counsel's cross-examination of the state's witnesses, appellant sought to present a defense demonstrating that the alleged victims were prostitutes who had lied about the nature of their sexual encounters with him and had conspired to falsely accuse him of the crimes in hopes of later bringing a civil lawsuit against him. Appellant also presented testimony and character evidence from three witnesses: his wife, a former coworker, and a friend. The testimony and evidence presented at trial established the following facts.

**A. Incident with Jane**

{¶4} In the evening hours of September 4, 2019, Jane was walking from her home in Hamilton, Ohio to a friend's home. A man, later identified as appellant, driving a black vehicle approached her and offered to give her a ride. Appellant picked up Jane near a Circle K convenience store that was located on Pleasant Avenue in the Lindenwald neighborhood of Hamilton. Appellant then drove into the Circle K parking lot and ran inside the store to purchase condoms while Jane waited inside the vehicle.

{¶5} Upon returning to the vehicle, appellant drove Jane to a different neighborhood in Hamilton, one located on the east side of the railroad tracks. Appellant stopped in front of an abandoned building located at 906 East Avenue. Appellant claimed he had lost his wallet and needed to look for it. He got out of the car and asked to search Jane's side of the vehicle. However, once Jane got out of the vehicle, appellant grabbed her by her hair and dragged her into the abandoned building.

{¶6} Appellant pulled Jane into one of the building's back rooms. As he was doing so, appellant struck Jane in the head and beat her "in the front" and "in the back." Jane attempted to block her face from the blows by putting up her hands. While she was being struck by appellant, Jane urinated on herself. Appellant told Jane to stop screaming or he

would continue to beat her. He also told Jane to take off her clothes and kiss him. Jane took of her clothing and tried to kiss appellant, but she was too upset. Appellant then raped Jane by inserting his penis into her vagina. Appellant did not wear a condom and ejaculated inside her.

{¶7} Once the sexual act was complete, appellant left the building. Jane got dressed and started walking towards her home, calling her mother as she exited the abandoned building. Jane did not ask anyone walking or driving by for help and did not call the police at that time as she was "in shock of everything" and just wanted her mother.

{¶8} Jane's mother met up with Jane. She described the physical state she found Jane in, stating that Jane "had blood and – well, she was crying, and [had] dirt running down her face. The side of her head was swollen. Her hair was all messed up. * * * [S]he had urinated on herself and had dirt all over. She looked pretty bad." Jane's mother walked Jane home, where Jane immediately tried to clean herself. Jane explained she used a douche to try to expel appellant's sperm.

{¶9} The next day, approximately eight hours after the incident, Jane called the police to report the rape. Jane was also examined by SANE nurse Meredith Gregory at the Bethesda Butler Hospital on this date. Gregory noted that Jane appeared anxious and sad. Gregory observed an abrasion to Jane's left nostril and left upper lip and noted that there were "multiple contusions, abrasions, erythema, which is redness, to [Jane's] back" near her shoulders. Gregory did not, however, see any bruising or visible injuries to the top of Jane's head, to her face or forehead, or to her thighs, buttocks, or genitalia. Gregory also did not find any shards of glass or debris in or on Jane's person during the examination, despite broken glass having been scattered throughout the abandoned building.

{¶10} For the rape kit, Gregory collected a DNA standard from Jane using an oral swab. Jane's perianal area, her labia minora, her labia majora, and vagina were swabbed

for evidence. The underwear and shirt Jane had worn on the night of the incident were collected as evidence. The underwear had blood spots on it. Photographs of Jane's injuries and the clothing she had worn the evening of September 4, 2019 were admitted into evidence at trial.

{¶11} After her initial report of the sexual assault and her examination by the SANE nurse, Jane became uncooperative with the city of Hamilton detective investigating her claims. Jane failed to appear for two scheduled interviews. It was not until May 27, 2020, more than eight months after initially reporting the rape, that Jane met with Detective Frank Botts. At this time, Jane told Detective Botts that she had seen the man who had assaulted her driving in the area where she lived. Jane had not called law enforcement when this occurred, but rather had run back inside her home.

{¶12} A six-man photo lineup was administered to Jane on May 27, 2020. Jane identified another man, "S.S," as the perpetrator of the sexual assault, stating "that kinda looks like him, but has a long hair [sic] and beard." Appellant's picture was not included in the lineup presented to Jane.

{¶13} A DNA sample was obtained from S.S. A DNA sample was also obtained from appellant, who was developed as a suspect following an investigation into sexual assaults reported by other victims. Timothy Augsback, a BCI forensic scientist, tested the swabs and underwear collected as part of Jane's rape kit against the DNA samples obtained from S.S. and appellant. Augsback testified that S.S. was not a contributor to any of the DNA mixtures found in the samples from Jane's rape kit. However, the perianal swab from the rape kit had a mixture of appellant's and Jane's DNA, with appellant being the major contributor. Augsback explained how rare the match would be in the general population of unrelated individuals, stating that appellant's "DNA profile in the sperm fraction was one in 50 million unrelated individuals." The swab collected from Jane's labia minora was also

tested and found to contain a mixture of appellant's and Jane's DNA. Augsback testified that the estimated frequency of the occurrence of appellant's DNA profile was rarer than one in one trillion unrelated individuals. Finally, Augsback tested the underwear worn by Jane on the night of the sexual assault, which was found to contain a mixture of appellant's and Jane's DNA. According to Augsback, the estimated frequency of the occurrence of appellant's DNA profile was rarer than one in one trillion unrelated individuals.

{¶14} At trial, defense counsel questioned Jane about her use of drugs and possible prostitution on the streets of Hamilton. Jane admitted she had a 2017 conviction for possession of heroin but denied she had used drugs on the date she was assaulted by appellant. Jane also denied that she had ever prostituted herself. She stated that when appellant offered her a ride on September 4, 2019, they "never discussed anything about money or any sexual acts at all." She also denied knowing Daisy or Marie or making plans with another women, "N.C.," to sue appellant following his criminal trial.

### B. Incident with Daisy

{¶15} On April 2, 2020, Daisy was on Central Avenue in Middletown, Ohio when appellant pulled his vehicle over and asked her if she needed a ride. Daisy, who had used heroin shortly before appellant offered her a ride, decided to get into appellant's vehicle. Appellant drove to the area of Carmody Boulevard and Central Avenue. After parking his car in the corner of a parking lot, both Daisy and appellant exited the vehicle. Appellant grabbed Daisy, pushed her down over the car, pulled down her pants and inserted his penis into her vagina. Daisy explained that she did not scream or fight appellant while the sexual assault occurred, as she feared something worse would happen to her if she resisted.

{¶16} When appellant finished, he drove off, leaving Daisy in the parking lot. Daisy pulled her pants back up and ran to the street to flag down help. An off-duty police officer was nearby and observed that Daisy was distraught and emotional. City of Middletown

police officers were called to the scene to investigate. Daisy was then transported to a nearby hospital where she was examined by a SANE nurse. An oral DNA swab, fingernail swabs, and a vaginal swab were collected from Daisy. The evidence was sent to BCI and tested by Augsback. Augsback compared the evidence from Daisy's rape kit to the DNA sample obtained from appellant. The vaginal swab had a mixture of appellant's and Daisy's DNA. Augsback testified that the estimated frequency of the occurrence of appellant's DNA profile was rarer than one in one trillion unrelated individuals.

### C. Incident with Marie

{¶17} On August 23, 2020, Marie was sitting sideways in a doorframe of an apartment building on East Avenue in Hamilton when a male, later identified as appellant, approached her from behind, grabbed her hair, and placed "something cold [o]n the back of [her] head." Marie assumed that the something cold was a gun. Appellant dragged Marie down the street and forced her into the passenger seat of his vehicle. Appellant entered the car and put a handgun on his lap, with the firearm "facing her." Appellant drove to another area of Hamilton and parked behind a building.

{¶18} Appellant pulled Marie from the car and pushed her up against a "skid" or pile of pallets that were laying on the ground. When Appellant told Marie to take off her clothes, she complied as she was afraid of what appellant would do if she refused. Appellant pushed Marie over the pallets and inserted his penis into her vagina before ejaculating inside of her. Appellant then took money out of Marie's pants pocket and left the scene.

{¶19} Marie put on her clothes and walked to a nearby restaurant to call the police. After speaking with officers from the city of Hamilton police department, Marie was taken to a nearby hospital for a sexual assault examination by a SANE nurse. Swab samples were collected from her mouth and from her labia majora, labia minora, and vagina. The evidence was sent to BCI and tested by Augsback. Augsback found appellant's DNA mixed

with Marie's DNA on the labia minora swab. Augsback testified that the estimated frequency of the occurrence of appellant's DNA profile was rarer than one in one trillion unrelated individuals.

{¶20} Hamilton Detective Anthony Kiep was assigned to investigate Marie's sexual assault claims. During an interview, Marie advised Detective Kiep that there were several prostitutes in Hamilton making rape accusations against appellant. Marie was aware that one prostitute was storing appellant's semen in her freezer. Detective Kiep tried to contact this woman, but the woman was uncooperative and refused to come in for an interview.

### D. Arrest of Appellant and Police Interview

{¶21} Using various businesses' surveillance footage and information obtained from Jane, Daisy, and Marie, law enforcement was able to identify appellant as a suspect. Detective Kiep conducted a social media search on appellant and discovered images of appellant at a gun range holding a semi-automatic handgun. During the execution of a search warrant at appellant's home, officers discovered a t-shirt that appeared to be a match for the t-shirt appellant was observed wearing on the Circle K surveillance footage from September 4, 2019, the date Jane was sexually assaulted. Officers were unable to locate a handgun in appellant's home, his vehicle, or his wife's vehicle. However, officers did find a package for a "Crossman handheld pellet gun," which displayed an image of a handgun on it.

{¶22} On February 18, 2021, appellant was arrested and interviewed by Detective Botts after being *Mirandized*. The interview was recorded and a portion of it played for the jury at trial. Appellant started the interview by claiming he had "never ever" picked up prostitutes or females who walked the street. However, after being advised of the rape allegations Jane, Daisy, and Marie had made against him, appellant changed his story. He told Detective Botts that there were "two or three times" he had picked up women and paid

them for sex – an activity he claims he engaged in once every six or seven months. He denied, however, that he raped any of these women or struck any of them. He also denied forcing any of the women into his car or using a gun. He claimed that the women he picked up for sex, including a woman on East Avenue in Hamilton, were responsible for picking the spots where they engaged in sex. Appellant was unable to recall the names of the women he paid for sex. When shown photographs taken from the September 4, 2019 Circle K security footage, appellant admitted the photographs were of him.

### E. Crim.R. 29 Granted in Part and Jury Verdict

{¶23} After hearing the foregoing testimony and evidence, the trial court granted appellant's Crim.R. 29 motion for acquittal as it related to count ten, the aggravated robbery with a deadly weapon charge. The remaining charges were submitted to the jury. Following deliberations, the jury found appellant guilty of three offenses relating to Jane: rape (count one), kidnapping in violation of R.C. 2905.01(A)(4) (count three), and assault (count four). The jury, however, acquitted appellant on all other charges, including those involving Daisy and Marie.

### F. Sentencing

{¶24} On November 29, 2021, appellant appeared before the trial court for sentencing. At this time the court determined that appellant's rape, kidnapping, and assault offenses were not allied offenses subject to merger. The court imposed an indefinite mandatory prison term of a minimum of eight years to a maximum of 12 years on the rape offense, a four-year prison term on the kidnapping offense, and a 180-day jail term on the misdemeanor assault offense. The court ordered the kidnapping sentence to be run consecutively to the rape sentence, for an aggregate indefinite prison term of 12 to 16 years. The 180-day jail term for assault was run concurrently to appellant's prison sentence for rape and kidnapping.

{¶25} Appellant appealed, raising seven assignments of error for review. For ease of discussion, we will address his third and fourth assignments of error together.

## II. ANALYSIS

### A. Evidentiary Issues

{¶26} Assignment of Error No. 1:

{¶27} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY PERMITTING THE STATE OF OHIO TO ADMIT A PORTION OF A RECORDED STATEMENT WHEN DEFENDANT-APPELLANT REQUESTED THE FULL RECORDING BE ADMITTED.

{¶28} In his first assignment of error, appellant argues the trial court abused its discretion when it admitted into evidence only a portion of his February 18, 2021 police interview with Detective Botts. Appellant contends that under Evid.R. 106, his request to play the full interview, which included an additional five minutes of content, should have been granted as the remainder of the recording was relevant to his defense. Appellant contends the "last approximate 5 minutes of the recording * * * revealed the regret of a man who was ashamed that he had frequented prostitutes, but who was not a brutal rapist."

{¶29} The record reflects that on the third day of trial, the state filed a motion in limine seeking permission to play a redacted version of appellant's interview with Detective Botts. Specifically, the state sought to introduce into evidence a version that removed those parts of the interview where Detective Botts discussed bond, the seriousness of the charges, and possible punishments appellant faced. The state also wanted to redact the very end of the video were appellant, alone in the interview room, cried and commented about the effects the charges would have on his life. The state contended that appellant's crying and comments were self-serving exculpatory statements that constituted inadmissible hearsay. Appellant's counsel objected to having the redacted version of the

- 10 -

interview played for the jury, contending that if any part of the interview was played, Evid.R. 106 required the full interview to be played. Defense counsel proffered the unredacted version of the interview.

{¶30} The trial court ultimately granted the state's motion in limine and permitted only the redacted interview to be played for the jury and to be admitted into evidence. The court found that the statements regarding bond, the seriousness of the charges, and possible punishments appellant faced were not appropriate statements for the jury to hear. The court noted, "If the State of Ohio had offered that portion, I would not admit that portion into evidence[.]" As for that portion of the interview where Detective Botts left the room and appellant cried and discussed the effects the charges were going to have on his life, the court found that the statements would not be "otherwise admissible" as contemplated by Evid.R. 106.

{¶31} The admission or exclusion of evidence is a matter committed to the sound discretion of the trial court. *State v. White*, 12th Dist. Warren No. CA2018-09-107, 2019-Ohio-4312, ¶ 30. An appellate court will not reverse the trial court's decision to admit or exclude relevant evidence absent an abuse of discretion. *Id.* An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Gearhart*, 12th Dist. Warren No. CA2017-12-168, 2018-Ohio-4180, ¶ 13.

{¶32} Evid.R. 106, known as the "rule of completeness," provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement *which is otherwise admissible* and which ought in fairness to be considered contemporaneously with it." (Emphasis added.) "The overriding purpose of the rule is to prevent one party from taking statements out of context and distorting them." *State v.*

*Arrington*, 12th Dist. Clinton No. CA2012-02-002, 2012-Ohio-5009, ¶ 11, citing *State v. Byrd*, 9th Dist. Lorain No. 03CA008230, 2003-Ohio-7168, ¶ 26.

**{¶33}** "The adverse party is, however, not automatically entitled to have the entire writing or recorded statement introduced into evidence simply by requesting it." *Id.* at ¶ 12. "Rather, the adverse party has the burden of showing that the additional part sought to be introduced *is not only admissible*, but also relevant to the portion that has already been introduced." (Emphasis added.) *Id.*, citing *State v. Holmes*, 77 Ohio App.3d 582, 585 (11th Dist.1991) and *State v. Scott*, 2d Dist. Montgomery No. 21260, 2006-Ohio-4016, ¶ 9. "Evid.R. 106 'contemplates a very high degree of discretion to be exercised by the trial judge.'" *Id.*, citing Weissenberger, *Weissenberger's Ohio Evidence Treatise*, Section 106.1, 49 (2011).

**{¶34}** Turning to the approximately five minutes that was excluded from evidence, we find that the trial court did not err by excluding that portion of the interview where Detective Botts advises appellant about the bond process, the seriousness of the charges, and possible punishments appellant faced. This portion of the interview was not needed to place any of appellant's prior statements or the detectives' questions eliciting appellant's statements into context. Furthermore, the admission of such statements was not relevant and not admissible as a jury should not be presented with evidence of possible punishment or sentence when determining guilt. *See* R.C. 2945.11; *State v. Pringle*, 12th Dist. Butler Nos. CA2007-08-193 and CA2007-09-238, 2008-Ohio-5421, ¶ 61-64; *State v. Gresham*, 8th Dist. Cuyahoga No. 81250, 2003-Ohio-744, ¶ 12.

**{¶35}** As for that portion of the interview where Detective Botts had left the interview room and appellant cried and commented to himself about the effects the charges were going to have on his life, we find that the trial court did not abuse its discretion in excluding the evidence. Appellant had the burden of showing that this additional part of the recording

was "otherwise admissible" and was also relevant to the portion of the video that had already been introduced. *See Scott*, 2006-Ohio-4016, ¶ 9; *Arrington*, 2012-Ohio-5009 at ¶ 12. Appellant failed to demonstrate either of these standards.

{¶36} Appellant's crying and comments to himself about his life being ruined by the charges was not necessary to put any of his earlier statements from the interview into context. *See, e.g., State v. Cuthbert*, 5th Dist. Delaware No. 11CAA070065, 2012-Ohio-4472, ¶ 53-57 (finding trial court did not abuse its discretion by only playing a portion of a recorded telephone call with appellant and his mother as the remainder of the call contained hearsay statements and did not serve the purpose of providing context or clearing up a distortion in the admissible portion of the recording). Further, the statements were not "otherwise admissible" as they are exculpatory statements that do not fall within an exception to the general rule excluding hearsay statements from evidence.

{¶37} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is not admissible unless it falls within one of the permissible hearsay exceptions. Evid.R. 802. One such exception is for admissions by a party opponent under Evid.R. 801(D)(2). Pursuant to that rule, a statement is not hearsay if "[t]he statement is offered against a party and is * * * the party's own statement, in either an individual or a representative capacity[.]"

{¶38} Although an out-of-court statement by a party-opponent is admissible by the state, "[t]hat does not mean that the reverse, a denial of civil or criminal liability, is likewise admissible." *State v. Beeson*, 2d Dist. Montgomery No. 19312, 2002-Ohio-4341, ¶ 55. "A denial does not have the same inherent reliability as a person's admission against his own interest. It is, or at least very well may be, self-serving. Therefore, a denial remains inadmissible hearsay if the proponent offers the statement to prove the truth of the matter

asserted." *Id.* Accordingly, Evid.R. 801(D)(2) cannot be used by a defendant to offer his own exculpatory out-of-court statement. *State v. Wilson*, 12th Dist. Clermont No. CA2001-09-072, 2002-Ohio-4709, ¶ 58; *State v. Lewis*, 7th Dist. Mahoning No. 03 MA 36, 2005-Ohio-2699, ¶ 127. "This prohibition has been explained partly by way of the state's right to cross-examine the declarant. * * * If the declarant does not take the stand, he cannot introduce his own statements made in a videotaped statement unless he can point to a hearsay exception." *Id.* at ¶ 128.

{¶39} Evid.R. 106 does not set forth an exception to the requirements of Evid.R. 801(D)(2). Rather, the plain language of Evid.R. 106 limits the rule of completeness to those portions of a recording that are "otherwise admissible." As appellant's crying statements at the end of the recorded police interview were exculpatory hearsay statements not admissible under Evid.R. 801(D)(2), we find that the trial court did not abuse its discretion in refusing to admit the statements at trial. *Accord Scott*, 2006-Ohio-4016 at ¶ 6-9. Appellant's first assignment of error is, therefore, overruled.

{¶40} Assignment of Error No. 2:

{¶41} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY PERMITTING THE STATE OF OHIO TO ADMIT HIGHLY PREJUDICIAL PHOTOGRAPHS OF DEFENDANT-APPELLANT THAT HAD NO RELEVANCE TO THE CHARGES.

{¶42} In his second assignment of error, appellant argues the trial court erred in admitting three "firearm-oriented" photographs into evidence.

{¶43} "When properly objected to, this court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard." *State v. Ruth*, 12th Dist. Fayette No. CA2019-08-018, 2020-Ohio-4506, ¶ 11. When a defendant fails to object, or fails to object at trial on the specific ground raised on appeal, the reviewing court is limited

to a plain-error analysis. *State v. Tibbetts*, 92 Ohio St.3d 146, 160-161 (2001), citing Evid.R. 103(A)(1) and *State v. Mason*, 82, Ohio St.3d 144, 159 (1998); *State v. Blake*, 12th Dist. Butler No. CA2011-07-130, 2012-Ohio-3124, ¶ 25. An alleged error is plain error only if it is "obvious" and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Jackson*, 12th Dist. Fayette No. CA2011-01-001, 2011-Ohio-5593, ¶ 13, citing *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 181.

{¶44} Appellant objected to the admission of two photographs obtained from his social media accounts that show him at a gun range holding a semi-automatic handgun, contending the photographs were not relevant and were "overly prejudicial." We therefore review the admission of these photographs under an abuse-of-discretion standard of review. As appellant did not object to the admission of the third photograph, which depicted an empty Crossman handheld pellet gun package that displayed an image of a handgun on it, we review the admission of that photograph under a plain-error standard of review.

{¶45} Evid.R. 402 provides that all relevant evidence is generally admissible. *State v. Hignite*, 12th Dist. Warren No. CA2015-07-063, 2015-Ohio-5204, ¶ 16. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. However, pursuant to Evid.R. 403(A), relevant evidence is not admissible and shall be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Unfairly prejudicial evidence is that quality of evidence that might result in an improper basis for a jury decision. *State v. Palmer*, 12th Dist. Butler Nos. CA2013-12-243 and CA2014-01-04, 2014-Ohio-5491, ¶ 23, citing *State v. Bowman*, 144 Ohio App.3d 179, 186 (12th Dist.2001). "[I]f the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may

be unfairly prejudicial." *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 24.

**{¶46}** "Courts have said that the admission of a photograph of a defendant with a weapon is appropriate when it is *similar* to one seen used in a crime." (Emphasis sic.) *State v. Lavender*, 1st Dist. Hamilton No. C-180003, 2019-Ohio-5352, ¶ 12, citing *State v. Lee*, 1st Dist. Hamilton No. C-160294, 2017-Ohio-7377, ¶ 12. Courts have also said the admission of a photograph of a defendant with a weapon is appropriate when it is similar to the type of weapon that law enforcement believed was used in the crime and the weapon can be tied to the defendant. *Id.* However, where the state does not present evidence suggesting that the photographed weapon is tied to the crime for which the defendant was on trial, then admission of the photograph is improper. *See State v. Gordon*, 8th Dist. Cuyahoga No. 106023, 2018-Ohio-2292, ¶ 71-72 (finding that the trial court erred in admitting a photograph taken from Facebook as there was no evidence tying the photograph to the defendant and "the state did not suggest that one of the guns in the photograph was the murder weapon in the instant case").

**{¶47}** In *Lavender*, the victim was killed by a .22-caliber weapon. *Lavender* at ¶ 2. At the defendant's aggravated murder trial, the state introduced, over the defendant's objection, a photograph of the defendant pointing a gun at the camera while holding another gun. Neither the state nor the defendant argued the gun the defendant was pointing at the camera was related to the case. *Id.* at ¶ 7. The state did, however, argue that the gun the defendant had in his other hand appeared to be a small-caliber revolver and that this was consistent with the weapon used to kill the victim. *Id.* On appeal, the defendant challenged the admission of the photograph. *Id.* at ¶ 6. The First District found that the trial court did not err in admitting the photograph as the court "had a reasonable basis to determine that the photograph was relevant, admissible, and that the probative value of the photograph was not substantially outweighed by undue prejudice." *Id.* at ¶ 13. As the court noted,

"[l]ogically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant." *State v. Wright*, 48 Ohio St.3d 5, 8, 548 N.E.2d 923 (1990). Courts have said that the admission of a photograph of a defendant with a weapon is appropriate when it is *similar* to one seen used in a crime. *See, e.g., State v. Lee*, 1st Dist. Hamilton No. C-160294, 2017-Ohio-7377, ¶ 12. Similarly, the trial court here allowed the admission of the photograph of a handgun that was similar to the type of weapon that law enforcement believed was used in the case and had been tied to [the defendant] through [a witness]. [The defendant] was able to then attack whether that asserted connection was credible, which he did through counsel's effective cross-examination and closing argument.

*Id.* at ¶ 12.

{¶48} The present case is similar to *Lavender* in that there was testimony from a state's witness tying the weapon purportedly used in the commission of a crime for which appellant was on trial to the type of weapon appellant was photographed holding in the pictures posted on his social media account. The two social media firearm-oriented photographs were relevant to the charges appellant faced for raping, kidnapping, and robbing Marie. At trial, Marie testified that she believed appellant had placed a handgun at the back of her head when forcing her into his car. She then observed appellant sit a handgun on his lap, with the firearm facing her when he drove her to the parking lot where he sexually assaulted her. Marie testified she could not "tell you the make and model of it. * * * [But she] just kn[e]w it was a handgun." During law enforcement's investigation of appellant, Detective Kiep found two photographs of appellant at a gun range holding a semi-automatic handgun – a weapon similar to the weapon observed by Marie. The photographs were therefore relevant to show appellant's access to a handgun. Appellant was able to attack whether his asserted connection to the weapon was credible though his cross-examination of the state's witnesses and during closing arguments. *Lavender* at ¶ 12. Use of the photographs was not unfairly prejudicial. Accordingly, we find that the trial court did not abuse its discretion in admitting the two social media firearm-oriented photographs.

{¶49} We further find that the trial court did not commit plain error in admitting a photograph of the empty package for the Crossman handheld pellet gun. The empty package for the pellet gun was found in appellant's home during the execution of the warrant. The package depicted a pellet gun that looked like a handgun that may have been used during the commission of the crimes purportedly committed against Marie. The photographed package of the handheld pellet gun was therefore relevant and admission of the photograph into evidence was not unfairly prejudicial.

{¶50} Appellant's challenge to the court's admission of the three firearm-oriented photographs into evidence is, therefore, without merit and his second assignment of error is overruled.

**B. Sufficiency and Manifest Weight**

{¶51} Assignment of Error No. 3:

{¶52} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BECAUSE HIS CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶53} Assignment of Error No. 4:

{¶54} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AS HIS CONVICTIONS FOR RAPE, KIDNAPPING AND ASSAULT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.

{¶55} In his third and fourth assignments of error, appellant contends his convictions for raping, kidnapping, and assaulting Jane were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶56} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency

of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶57} On the other hand, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the

issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶58} Appellant was convicted of rape in violation of R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." A person acts purposely "when it is the person's specific intention to cause a certain result." R.C. 2901.22(A). "Force" is defined by the Revised Code as "any violence, compulsion, or constraint physically exerted by any means or against a person or thing." R.C. 2901.01(A)(1). Sexual conduct includes "vaginal intercourse between a male and female" and "without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another." R.C. 2907.01(A).

{¶59} Appellant was also convicted of kidnapping in violation of R.C. 2905.01(A)(4), which provides that "[n]o person, by force, threat, or deception, * * ** shall remove another from the place where the other person is found or restrain the liberty of the other person, * * * [t]o engage in sexual activity, as defined in Section 2907.01 of the Revised Code, with the victim against the victim's will." Sexual activity means sexual contact or sexual conduct, including vaginal intercourse. R.C. 2907.01(C).

{¶60} Finally, appellant was convicted of assault in violation of R.C. 2903.13(A), which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to another." Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." Any injury, illness, or other physiological impairment, regardless of its gravity or duration, constitutes "physical harm" to a person. R.C. 2901.01(A)(3).

{¶61} After reviewing the record, weighing inferences and examining the credibility

of the witnesses, we find appellant's convictions for rape, kidnapping, and assault are supported by sufficient evidence and are not against the manifest weight of the evidence. The state presented testimony and evidence from which the jury could have found all the essential elements of the offenses proven beyond a reasonable doubt. Jane testified that appellant picked her up near the Circle K on Pleasant Avenue and drove her to an abandoned building on East Avenue in Hamilton. Using his need to search for his missing wallet as a ruse, appellant approached Jane on the passenger side of the vehicle, grabbed her hair and forcibly pulled her away from the car and into a back room of the abandoned building. While forcing Jane into the abandoned building, appellant assaulted Jane, striking her in the head and beating her "in the front" and "in the back." Once inside the back room, appellant engaged in forcible sexual conduct with Jane, vaginally raping her with his penis before ejaculating inside of her.

{¶62} Jane was injured during the incident. As the SANE nurse who examined Jane testified, Jane had an abrasion to her left nostril and upper lip as well as "multiple contusions, abrasions, erythema, which is redness, to [her] back" near her shoulders. Forensic evidence obtained during the SANE nurse's examination was later tested by a BCI forensic scientist. Appellant's DNA was found on swabs taken from Jane's perianal area and labia minora and on the underwear Jane had worn on the night of the sexual assault. Jane's testimony, evidence gathered during her sexual assault examination, and the forensic analysis of the rape kit was evidence demonstrating appellant assaulted, kidnapped, and raped Jane.

{¶63} Appellant challenges Jane's credibility and the weight given to her testimony. Appellant, who had admitted to picking up prostitutes in Hamilton, theorizes that Jane was a prostitute and that she and other prostitutes had developed a scheme to try to extort him for money or set up a civil suit for damages. Appellant contends the fact that Marie knew

of a prostitute storing his semen in her freezer demonstrated prostitutes in Hamilton were acting with nefarious intentions. Appellant contends Jane lied when she denied being a prostitute, lied about not knowing Marie or Daisy, and lied about not making plans with them or anyone else to sue appellant following the criminal trial. To support his claim that Jane was not a credible witness, appellant relies on the fact that Jane has a prior felony conviction for possession of heroin and the fact that she gave inconsistent stories about where appellant had picked her up on the night of the rape. When Jane originally gave a statement to officers, she had claimed that appellant had offered her a ride and picked her up at Circle K. However, after surveillance footage from the store showed her arriving at the store in appellant's car, Jane later changed her story and stated appellant picked her up "near" Circle K.

{¶64} Appellant further contends Jane's appearance and lack of serious physical injuries in the aftermath of the alleged rape, assault, and kidnapping also cast doubt on the credibility of her testimony. Appellant argues that if the events described by Jane had actually occurred, then one would have expected the SANE nurse to have observed more injuries to Jane's scalp and face, such as missing hair, bruises, or scratches, as well as visible injuries to her back, thighs, or vagina, including bruises and cuts from broken glass that was spread out in the abandoned building. Appellant contends that one would have also expected to find blood on more than Jane's underwear. Appellant noted that Jane's shirt, though dirty, did not have any blood on it.

{¶65} Appellant also contends that Jane's behavior during the kidnapping and sexual assault and her actions after the incident also cast doubt on the credibility of her story. Appellant notes that Jane admitted that she did not fight back or try to escape from appellant during the sexual assault, and once appellant finished and left her alone in the empty building, she did not immediately call police. Instead, Jane got dressed, started

walking home, and called her mother. She did not try to flag anyone walking or driving by for help. Jane then waited approximately eight hours to report the sexual assault to the police. After her initial report, Jane became uncooperative with the police, failing to appear for scheduled interviews. Jane waited until May 2020 to report seeing the man who raped her driving in the area where she lived.

{¶66} The jury, through defense counsel's cross-examination of the state's witnesses and closing arguments, was presented with appellant's theory that Jane lied about the events that occurred on September 4, 2019. They heard about the inconsistencies in her story and were given the opportunity to weigh her version and explanation of events against appellant's version. Jane explained that once appellant had her in the back room of the abandoned building, she ceased resisting and screaming for help so that appellant would stop beating her. She also explained that after the sexual assault, she was "in shock of everything" and just wanted her mother and the safety of her home.

{¶67} "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17. This is because, "[a]s the trier of fact in [the] case, the jury was in the best position to judge the credibility of witnesses and the weight to be given to the evidence." *State v. Johnson*, 12th Dist. Warren Nos. CA2019-07-076 and CA2019-08-080, 2020-Ohio-3501, ¶ 24. The jury considers any inconsistencies in the witnesses' testimony and resolves them accordingly, believing all, part, or none of each witnesses' testimony. *State v. Enoch*, 12th Dist. Butler No. CA2019-07-117, 2020-Ohio-3406, ¶ 27. Here, the jury clearly found Jane's testimony, which was corroborated by the visible injuries she sustained and the DNA evidence obtained from the rape kit, credible.

{¶68} Given the evidence presented at trial, the jury was entitled to find beyond a reasonable doubt that appellant committed assault, kidnapping, and rape against Jane. Appellant's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. The jury did not lose its way and create such a manifest miscarriage of justice that appellant's convictions must be reversed and a new trial ordered. Appellant's third and fourth assignment of error are overruled.

## C. Sentencing Issues

{¶69} Assignment of Error No. 5:

{¶70} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY FAILING TO MERGE THE RAPE AND KIDNAPPING COUNTS.

{¶71} In his fifth assignment of error, appellant argues the trial court erred in refusing to merge the rape and kidnapping offenses as allied offenses of similar import. Appellant contends the offenses should have been merged at sentencing as the offenses involved a single victim, were committed at the same time, and the kidnapping offense was committed merely to facilitate the rape offense.

{¶72} Pursuant to R.C. 2941.25, Ohio's multiple-count statute, the imposition of multiple punishments for the same criminal conduct is prohibited. *State v. Brown*, 186 Ohio App.3d 437, 2010-Ohio-324, ¶ 7 (12th Dist.). R.C. 2941.25 states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶73} In determining whether offenses are allied and should be merged for

sentencing, courts are instructed to consider three separate factors – the conduct, the animus, and the import. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph one of the syllabus. Offenses do not merge and a defendant may be convicted and sentenced for multiple offenses if *any* of the following are true: "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus and ¶ 25. Two or more offenses of dissimilar import exist "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

{¶74} Application of the allied offense test "'may result in varying results for the same set of offenses in different cases. But different results are permissible, given that the statute instructs courts to examine a defendant's conduct – an inherently subjective determination.'" *Id.* at ¶ 32, quoting *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 52. Whether offenses constitute allied offenses of similar import subject to merger under R.C. 2941.25 is a question of law that appellate courts review de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 28. "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Lewis*, 12th Dist. Clinton No. CA2008-10-045, 2012-Ohio-885, ¶ 14.

{¶75} In *State v. Logan*, 60 Ohio St.2d 126, 130 (1979), the Ohio Supreme Court provided guidelines for determining whether kidnapping and another offense are allied offenses that should merge prior to sentencing. Though *Logan* predates *Ruff*, "the *Logan* guidelines are still relevant to determining whether rape and kidnapping convictions merge." *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, ¶ 108. The *Logan* guidelines are as

follows:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus. Further, "[s]ecret confinement, *such as in an abandoned building* or nontrafficked area, without the showing of substantial asportation, may, in a given instance, also signify a separate animus and support a conviction for kidnapping apart from the commission of an underlying offense." (Emphasis added.) *Id.* at 135.

{¶76} In *Logan*, the defendant was convicted of rape and kidnapping, among other offenses. The defendant confronted the victim while she was walking down the street and offered her some pills. When the victim refused to accept the pills, the defendant produced a knife, held it to the victim's throat, and forced her into an alley. The defendant then walked the victim down the alley, around a corner, and down a flight of stairs before raping her at knifepoint. *Id.* at 127. Separate sentences were imposed on the rape and kidnapping convictions. *Id.* On appeal to the Ohio Supreme Court, the defendant asserted that his kidnapping and rape convictions constituted allied offenses of similar import subject to merger. *Id.*

{¶77} Applying the guidelines set forth above, the supreme court agreed with the defendant. The court found that "the restraint and movement of the victim had no significance apart from facilitating the rape. The detention was brief, the movement was

slight, and the victim was released immediately following the commission of the rape." *Id.* at 135. As such, the court concluded the defendant did not have "a separate animus to commit the kidnapping." *Id.* The court then considered whether "the victim, by such limited asportation or restraint, was subjected to a substantial increase in the risk of harm separate from that involved in the underlying crime." *Id.* The court determined that the facts failed to show "that the asportation of the victim down the alley to the place of rape presented a substantial increase in the risk of harm separate from that involved in the rape." *Id.* Consequently, the court determined that the defendant's rape and kidnapping offenses were allied offenses of similar import.

{¶78} Turning to the present case, we find that appellant's convictions for rape and kidnapping are not allied offenses subject to merger under R.C. 2941.25 as they were committed with separate animus. The evidence at trial demonstrated that appellant's asportation of Jane removed her from her known neighborhood in Lindenwald to a different neighborhood in Hamilton, one located on the east side of the railroad tracks. Appellant then dragged Jane by the hair from his car into an abandoned building, striking her in the head as he pulled her into one of the building's back rooms. Appellant's movement of Jane, as well as his secret confinement of Jane in a back room of an abandoned building, is evidence of a separate animus for the kidnapping offense. *See Logan* at 135 (noting that "[s]ecret confinement, such as in an abandoned building * * * * may, in a given instance, also signify a separate animus and support a conviction for kidnapping apart from the commission of an underlying offense"); *See also State v. DeWees*, 11th Dist. Trumbull No. 2017-T-0038, 2018-Ohio-1677, ¶ 33-45 (finding rape and kidnapping were not allied offenses where the victim was dragged five or six feet up an inclined embankment that was not visible from the paved sidewalk before being forcibly raped by the defendant); *State v. Helms*, 7th Dist. Mahoning No. 15 MA 0183, 2017-Ohio-4383, ¶ 17 (finding rape and

kidnapping were committed with separate animus where the defendant "drove the victim to a different location to rape her; he did not rape her in the location where he began making sexual advances"); *State v. Ortiz,* 8th Dist. Cuyahoga No. 95026, 2011-Ohio-1238, ¶ 10-21 (finding convictions for rape and kidnapping did not merge where defendant lured the victim into his vehicle under false pretenses and moved her into a padlocked empty building before raping her). Furthermore, leaving Jane in the abandoned building, an unfamiliar environment, while she was injured and in shock subjected her to an increased risk of harm separate from that involved in the rape. *See id.* at ¶ 18.

{¶79} As appellant's movement of Jane from one neighborhood to another and his secretive concealment of Jane in the abandoned building had significance apart from the rape, we find that there was a separate animus as to the rape and kidnapping offenses. The trial court, therefore, did not error in not merging the offenses at sentencing. Appellant's fifth assignment of error is overruled.

{¶80} Assignment of Error No. 6:

{¶81} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY IMPOSING CONSECUTIVE SENTENCES FOR RAPE AND KIDNAPPING.

{¶82} In his sixth assignment of error, appellant argues the trial court erred in running his sentence for kidnapping consecutively to his sentence for rape.

{¶83} This court reviews felony sentences pursuant to the standard of review set forth in R.C. 2953.08(G)(2). *State v. Julious*, 12th Dist. Butler No. CA2015-12-224, 2016-Ohio-4822, ¶ 8. Pursuant to that statute, an appellate court may modify or vacate a sentence only if it determines by clear and convincing evidence, that "'the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law.'" *State v. Harp*, 12th Dist. Clermont No. CA2015-12-096, 2016-Ohio-4921,

¶ 7, quoting *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1.

**{¶84}** A consecutive sentence is contrary to law where the trial court fails to make the consecutive sentencing findings required by R.C. 2929.14(C)(4). *State v. Miller*, 12th Dist. Butler No. CA2021-07-079, 2022-Ohio-1438, ¶ 9. Pursuant to R.C. 2929.14(C)(4), a trial court must engage in a three-step analysis and make certain findings before imposing consecutive sentences. *State v. Dillon*, 12th Dist. Madison No. CA2012-06-012, 2013-Ohio-335, ¶ 9. First, the trial court must find that the consecutive sentence is necessary to protect the public from future crime or to punish the offender. *Id.*, citing R.C. 2929.14(C)(4). Second, the trial court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. *Id.* Third, the trial court must find that one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

**{¶85}** "A trial court satisfies the statutory requirement of making the required findings when the record reflects that the court engaged in the required analysis and selected the appropriate statutory criteria." *State v. Setty*, 12th Dist. Clermont Nos. CA2013-06-049 and CA2013-06-050, 2014-Ohio-2340, ¶ 113. In imposing consecutive sentences, the trial court

is not required to provide a word-for-word recitation of the language of the statute or articulate reasons supporting its findings. *Id.* Nevertheless, the record must reflect that the trial court engaged in the required sentencing analysis and made the requisite findings. *Id.* The court's findings must thereafter be incorporated into its sentencing entry. *State v. Ahlers*, 12th Dist. Butler No. CA2015-06-100, 2016-Ohio-2890, ¶ 10.

**{¶86}** At sentencing, the court made the following findings when imposing the consecutive sentence:

> As to the consecutive findings, the Court will note that consecutive sentences under 2929.14(C)(4) would be necessary to protect the public from future crimes as well as necessary to punish the offender.
>
> The Court will find that consecutive sentences are not disproportionate to the seriousness of the conduct in this case and the danger possessed to the public. And the Court will further find that at least two of the offenses were committed as for – part of one or more course of conduct, the harm caused by two or more or so greater [sic] or unusual that no single prison term could adequately reflect the seriousness of the offender's conduct.

The findings were then incorporated into the sentencing entry.

**{¶87}** Though acknowledging the necessary findings were made by the trial court, appellant nonetheless argues that the record does not support the findings or the imposition of consecutive sentences as he "had no prior criminal conduct, the injuries were minimal, and there was no harm caused by the alleged kidnapping beyond that of the alleged rape."

**{¶88}** We disagree with appellant's arguments and find that the trial court's R.C. 2929.14(C)(4) consecutive sentencing findings are supported by the record. Though appellant does not have a prior criminal history, appellant was convicted of two serious, first-degree felony offenses: kidnapping and rape. The record reflects that appellant trolled the streets looking for his victim. He moved his victim from one neighborhood to another and forced her into a back room of an abandoned building by pulling her hair and striking

her in the face before vaginally raping her. He then left her injured and in shock in the building. These facts demonstrate the need to both punish appellant and to protect members of the public from future crime and also demonstrate that the imposition of consecutive sentences is not disproportionate to the seriousness of appellant's conduct and the danger he poses to the public.

{¶89} Furthermore, though appellant seeks to minimize the harm caused to the victim by his actions, the record reflects the victim suffered both physical and psychological harm. Jane felt pain from being struck in the face and beaten "in the front" and "in the back. She suffered abrasions to her left nostril and upper lip, as well as multiple contusions, abrasions, and erythema on her back near her shoulders. Jane also suffered the emotional trauma that came from not only being raped, but also the trauma of being moved from one neighborhood to another, being forced into a back room of an abandoned building, and then left in an unknown environment while hurt and in shock following a sexual assault. Appellant's actions caused Jane to feel unsafe in her neighborhood. She indicated that in the weeks and months that went by after the incident, when she thought she saw appellant drive by in her neighborhood, she was so fearful that she had to run back to the safety of her home. Given the circumstances of the offenses and the physical and psychological harm caused to the victim, the trial court's finding that no single prison term for any of the crimes adequately reflected the seriousness of appellant's conduct is supported by the record.

{¶90} Accordingly, when considering the nature of appellant's conduct, as well as the totality of the harm inflicted by his actions, we conclude that the trial court's R.C. 2929.14(C)(4) findings are supported by the record and that the imposition of consecutive sentences was not contrary to law. Appellant's sixth assignment of error is, therefore, overruled.

{¶91} Assignment of Error No. 7:

{¶92} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY IMPOSING AN INDEFINITE SENTENCE.

{¶93} In his seventh assignment of error, appellant contends the indefinite sentence imposed by the trial court pursuant to the Reagan Tokes Law is unconstitutional as it violates his due process rights, impinges upon his constitutional right to a jury, and runs afoul of the separation-of-powers doctrine. However, it is undisputed that appellant did not raise a challenge to the constitutionality of the Reagan Tokes Law with the trial court. As this court has repeatedly held, "arguments challenging the constitutionality of the Reagan Tokes Law are forfeited and will not be heard for the first time on appeal in cases where the appellant did not first raise the issue with the trial court." *State v. Blaylock*, 12th Dist. Butler No. CA2020-11-113, 2021-Ohio-2631, ¶ 7. *See also State v. McClendon*, 12th Dist. Warren No. CA2021-08-075, 2022-Ohio-2830, ¶ 13; *State v. Lee*, 12th Dist. Warren No. CA2021-05-047, 2022-Ohio-248, ¶ 34-35; *State v. Teasley*, 12th Dist. Butler No. CA2020-01-001, 2020-Ohio-4626, ¶ 9; *State v. Alexander*, 12th Dist. Butler No. CA2019-12-204, 2020-Ohio-3838, ¶ 8-9.

{¶94} Given this court's precedent declining to hear any arguments challenging the constitutionality of the Reagan Tokes Law in cases where the issue was not first raised with the trial court, appellant's seventh assignment of error is overruled.[3]

---

3. We note that even if appellant had not forfeited his challenge to the constitutionality of the Reagan Tokes Law, this court has already determined that R.C. 2967.271 does not run afoul of an offender's due process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution. *State v. Jackson*, 12th Dist. Butler No. CA2020-07-077, 2021-Ohio-778, ¶ 15; *State v. Morris*, 12th Dist. Butler No. CA2019-12-205, 2020-Ohio-4103, ¶ 10; *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837, ¶ 17. This court has also determined that the Reagan Tokes Law does not violate the separation-of-powers doctrine. *State v. Suder*, 12th Dist. Clermont Nos. CA2020-06-034 and CA2020-06-035, 2021-Ohio-465, ¶ 25. The same is true as it relates to a challenge alleging the Reagan Tokes Law impinges on an offender's constitutional right to a jury. *State v. Rose*, 12th Dist. Butler No. CA2021-06-062, 2022-Ohio-2454, ¶ 32-37; *State v. Rogers*, 12th Dist. Butler No. CA2021-02-010, 2021-Ohio-3282, ¶ 20.

## III. CONCLUSION

{¶**95**} Having found no merit to appellant's assigned errors, we hereby affirm his conviction and sentence.

{¶**96**} Judgment affirmed.

S. POWELL, P.J., and BYRNE, J., concur.