[Cite as *State v. Thomas*, 2025-Ohio-4895.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2024-12-083 |
| Appellee, | : | |
| vs. | : | OPINION AND JUDGMENT ENTRY 10/27/2025 |
| ELIJAH MALIK THOMAS, | : | |
| Appellant. | : | |
| | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COMMON PLEAS
Case No. 23CR40721

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Kidd & Urling LLC, and Thomas W. Kidd, Jr., for appellant.

**O P I N I O N**

**PIPER, P.J.**

{¶ 1} Appellant, Elijah Malik Thomas, appeals from his conviction in the Warren County Court of Common Pleas. The trial court found Thomas guilty of aggravated murder and improperly discharging a firearm at or into a habitation, both of which included three-year firearm specifications, following a bench trial. Thomas was thereafter sentenced by

the trial court to serve consecutive sentences totaling 40 to 42 years to life in prison. For the reasons outlined below, we affirm the trial court's decision finding Thomas guilty of the above-named offenses and specifications. However, because the trial court failed to make the necessary consecutive sentencing findings at Thomas' sentencing hearing, we reverse the trial court's imposition of consecutive sentences and remand this matter to the trial court for the limited purpose of resentencing.

**Facts and Procedural History**

{¶ 2}   On July 24, 2023, the Warren County Grand Jury returned an indictment charging Thomas with the aggravated murder of Katelyn Puckett, his ex-girlfriend and the mother of two of his children. This charge was prosecuted as an unclassified felony in violation of R.C. 2903.01(A). The indictment also charged Thomas with improperly discharging a firearm at or into a habitation. This charge was prosecuted as a second-degree felony in violation of R.C. 2923.161(A)(1). Both charges also included three-year firearm specifications. The charges arose after it was alleged Thomas purposely, and with prior calculation and design, shot and killed Puckett on the morning of June 17, 2023. Thomas shot Puckett while she was standing in the doorway of her apartment located in Franklin, Warren County, Ohio.[1] Thomas was arraigned on July 28, 2023, where he entered a not guilty plea. Bail was set at $1,000,000.

*The Two-Day Bench Trial*

{¶ 3}   On November 4 and 5, 2024, the matter proceeded to a two-day bench trial. During this trial, the trial court heard testimony and accepted evidence from a total of ten witnesses. These witnesses included Puckett's mother, Michelle Burks, Puckett's best friend, Haley Johnson, and the lead detective on the case, Detective Amanda Myers.

---

1. Thomas was charged with several other offenses that are not relevant to this appeal.

These witnesses also included Thomas, who testified in his own defense. The testimony and evidence admitted at trial established the following.

{¶ 4} In the fall of 2020, after meeting on Facebook, Puckett began having a romantic relationship with Thomas. This relationship resulted in Puckett giving birth to two of Thomas' children, one born on October 25, 2021, and the other born on April 10, 2023. Puckett's relationship with Thomas appeared to be going well. That is, so long as other people were around. However, behind closed doors, the couple was characterized as being a "mess" given the physical and verbal abuse that Thomas would routinely inflict upon Puckett. Thomas was also alleged to be very jealous and extremely possessive over Puckett.

{¶ 5} On June 2, 2023, after having lived together for nearly three years, Puckett broke up with Thomas. This breakup made Thomas very angry. Nevertheless, following their breakup, Puckett and the children moved out of Thomas' apartment located in Lebanon, Warren County, Ohio. After moving out of Thomas' apartment, Puckett then moved her and the children into a new apartment located in Franklin, Warren County, Ohio. Puckett lived in this apartment with the children, as well as her mother, Burks, her best friend, Johnson, and Johnson's then one-year-old daughter.

{¶ 6} After their breakup, Thomas would repeatedly call, text, and message Puckett and her friends and family through Facebook. These messages included Thomas telling Puckett "[l]ike that matters" in response to Puckett threatening to get a protection order against him if he did not stop harassing her. This is in addition to Thomas telling Puckett during that same text message conversation, "[b]itch I wanna die," "I don't [give a fuck]," "[k]ill me or I'm go kill somebody," and "[you] think I'm playing just wait."

{¶ 7} Thomas would also post veiled threats to Puckett on his Facebook page. This included Thomas posting, "[Motherfuckers] don't know I will kill u over these

- 3 -

comments yeh bitch I'm that fucked [up] somebody dying tonight." This also included Thomas posting, "[Motherfucker] think I'm playing bout my kids I'm go shoot somebody in a min" and "Ima pop if you try me I just told you I don't fight people." These postings— one of which Thomas posted just shy of two hours before he shot and killed Puckett— made Puckett sad and scared of what Thomas might do to her.

{¶ 8}  Following her breakup with Thomas, Puckett began having a new romantic relationship with another man. We will refer to this man as Derrick Knopp.[2] Thomas was depressed, extremely upset, and "very angry" when he found out about Puckett's relationship with Knopp. Thomas expressed that anger by, among other things, posting a message on his Facebook page that read:

> Th[e] [bitch] really got my kids another like I won't kill all [you motherfuckers] it only been a week and my daughter on 2 months and the bitch got herpes that quick

{¶ 9}  On June 13, 2023, approximately three days before he shot and killed Puckett, Thomas scrawled a message on the interior wall of his apartment that read:

> She did what she did that's what happens to hoe stop playin with people emotions, I loved her but she played me… I love all my kids sorry this had to happen

This was in addition to Thomas telling Puckett that she better tell him the truth about her relationship with Knopp "b4 shit get dangerous," that he was planning on "killing" Knopp for simply having talked to Puckett, and that Knopp "better know [how] to shoot" because if he ever saw Knopp that he would shoot him "on site."

{¶ 10}  On June 16, 2023, Puckett went to Kings Island with her mother, Burks, her best friend, Johnson, and her new boyfriend, Knopp.[3] While there, and upon learning that

---

2. We have given this man a fictitious name to protect his identity.

3. Kings Island is an amusement park located in Mason, Warren County, Ohio.

Puckett had recently lost her phone, Thomas began texting and calling Burks' phone "non-stop," "blowing her phone up," a total of 25 times. This included Thomas sending a text message to Burks that read, "[h]ope y'all know I ain't stupid."

{¶ 11} The record indicates that Thomas was eventually able to speak to Puckett; however, this resulted in Puckett and Thomas arguing over the phone for several minutes. This argument caused Puckett to become aggravated and upset. But, notwithstanding her argument with Thomas, Puckett had fun at Kings Island during the approximately six or seven hours that she and her group were at the park. Puckett also had fun during the nearly three hours that she and her group spent talking with friends in downtown Cincinnati before heading back to Franklin for the night.

{¶ 12} That same day, on June 16, 2023, at approximately 7:40 p.m., Thomas made a "check-in" on Facebook from a local firearms store and gun range located in Lebanon. This "check-in" included Thomas posting to his Facebook page, "[h]ad to grab a new toy I deserve it."[4] Later that night, at approximately 11:30 p.m., Thomas took an Uber to a convenience store located across the street from Puckett's apartment in Franklin. Thomas testified that he did this "[j]ust to find out what was going on. See if my kids were there, see if [Puckett] was there."

{¶ 13} Upon being dropped off by the Uber, Thomas made his way to Puckett's apartment "[a]round like 11:50, maybe 12:00ish." Shortly thereafter, at 12:12 a.m. on the morning of June 17, 2023, Thomas made another "check-in" on Facebook from just outside of Puckett's apartment. Sixteen minutes later, at 12:28 a.m., Thomas posted on his Facebook page, "We outside." Two minutes later, at 12:30 a.m., Puckett, Burks, Johnson, and Knopp arrived back at Puckett's apartment in Franklin.

---

4. A "check-in" is a type of Facebook post that is linked to a physical location that includes GPS longitude and latitude information.

{¶ 14} Upon Burks' parking the car, the group exited from the vehicle and began walking up the sidewalk towards the front door to Puckett's apartment, Johnson, Burks, Puckett, and Knopp, in that order. Burks and Johnson testified that they did not see anyone else outside the apartment at this time. Burks and Johnson also testified that they did not hear any noise outside the apartment. It was only when Johnson began unlocking the door to Puckett's apartment that they noticed Thomas as he emerged from the bushes holding a handgun. Thomas was at this time clad in all black with the hood of his sweatshirt pulled up over his head. Despite it being the middle of summer, Thomas was also wearing gloves.

{¶ 15} Upon Thomas emerging from the bushes, Puckett's new boyfriend, Knopp, ran into Puckett's apartment and out the back door. As Knopp fled, Thomas approached Puckett and pointed the handgun at her head. Thomas then stated, "you bitches thought I was kidding" or "you bitches thought I was playing with you." Puckett then jumped in front of Thomas and began waving her arms to distract him. While waiving her arms, Puckett asked Thomas to "please stop." Puckett also told Thomas that "she would go home" with him to his apartment and that "they'd fix things." Thomas, however, just "started shooting her."

{¶ 16} Thomas initially fired eight shots. These eight shots struck Puckett multiple times in various parts of her body. This included one bullet that entered through the left side of Puckett's back, before breaking one of her ribs, piercing her lung, and hitting her spine. The bullet then travelled into Puckett's right upper arm, where it severed a major artery. Thomas did this with a handgun that he had purchased from a local pawn shop approximately one month earlier.[5] Used targets depicting human silhouettes were later

---

5. The handgun Thomas used to shoot Puckett was a Taurus Model G3 9mm semi-automatic pistol.

found in Thomas' apartment, indicating he had used the handgun for target practice in the weeks leading up to the shooting.

{¶ 17} Upon being shot, Puckett fell to the ground bleeding. As Puckett fell, Thomas turned and ran back towards the bushes where he had emerged. As he ran, Thomas fired one more shot back toward Puckett's apartment, where Puckett lay splayed out across the floor, struggling to breathe. While running, Thomas flung his cellphone over a fence. Thomas also discarded his handgun into a nearby creek.

{¶ 18} After Thomas fled, Burks then called 9-1-1. Johnson also called 9-1-1. Shortly thereafter, first responders arrived at the scene and attempted to revive Puckett. Puckett, however, could not be saved and was pronounced dead at the scene. Puckett was 23 years old at the time of her passing. Bullet fragments were later discovered inside Puckett's apartment. This included one bullet fragment that was found on top of a child's baby blanket.

{¶ 19} Later that morning, at 5:23 a.m., approximately four hours after Thomas had shot and killed Puckett, Thomas posted to his Facebook page, "I fucked up I'm sorry love u baby girl." A few hours later, still on the morning of June 17, 2023, Thomas was located by police and placed under arrest. Thomas' arrest occurred as his mother was reportedly driving him to the police station to turn himself in for having shot and killed Puckett.

{¶ 20} Thomas testified in his own defense. As part of his testimony, Thomas admitted that he had shot and killed Puckett. Thomas denied, however, that he had done so with any prior calculation and design. Thomas instead claimed that he had shot and killed Puckett in a fit of rage after he saw Puckett with another man. Specifically, as Thomas testified when asked how it made him feel when seeing Puckett with her new boyfriend, Knopp, "I was upset and didn't know what to think about it. You know I just felt deceived about everything and –." Thomas testified that he then "just pointed the gun at

[Puckett]," and, upon Burks supposedly yelling for someone to call the police, "just fired away."

*The Trial Court's Verdict*

{¶ 21} Based upon this testimony and evidence, and when considering the credibility of the witnesses who testified before it at trial, the trial court found Thomas guilty of the aggravated murder of Puckett and of improperly discharging a firearm at or into a habitation. The trial court also found Thomas guilty of the firearm specifications that accompanied those two charges. In so doing, the trial court found "nothing sudden about the provocation in this case." The trial court instead found:

> You knew what you were doing in advance. You even wrote an apology on the wall. And, I think that that scribble on the wall is more impactful to me than all the Facebook messages, text messages, status updates combined. This was murder. And in the old days we used to call it premeditated murder. Now we don't use the term premeditated, we use prior calculation and design. I think there was prior calculation and design on your part. I think that you went there with a firearm, with the purpose of killing her.

{¶ 22} On November 26, 2024, the trial court held a sentencing hearing. During that hearing, the trial court sentenced Thomas to 30 years to life in prison on the aggravated murder charge and four to six years in prison on the charge of discharging a firearm at or into a habitation. The trial court also ordered Thomas to serve an additional three years in prison for each of the firearm specifications that accompanied those two charges. The trial court ordered each of these sentences to be served consecutively to one another. This resulted in Thomas being sentenced to a total, aggregate sentence of 40 to 42 years to life in prison, less 429 days of jail-time credit.

{¶ 23} On December 2, 2024, Thomas filed a notice of appeal. Thomas' appeal was submitted to this court for consideration on September 10, 2025. Thomas' appeal

now properly before this court for decision, Thomas has raised three assignments of error for review.

**Thomas' First Assignment of Error**

{¶ 24} THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW AND/OR AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO SUSTAIN THE AGGRAVATED MURDER CONVICTION.

{¶ 25} In his first assignment of error, Thomas argues his aggravated murder conviction was not supported by sufficient evidence and/or was against the manifest weight of the evidence. We disagree.

*Sufficiency and Manifest Weight Standards of Review*

{¶ 26} A claim challenging the sufficiency of the evidence "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 2013-Ohio-5202, ¶ 34 (12th Dist.). When making this determination, "[t]he relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Roper*, 2022-Ohio-244, ¶ 39 (12th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. When conducting this review, "appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *State v. Carter*, 2018-Ohio-29, ¶ 7 (8th Dist.), citing *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79-80. Therefore, when determining whether a defendant's conviction was supported by sufficient evidence, "[t]his court merely determines whether there exists any evidence in the record that the trier of fact could have believed, construing all evidence in favor of the state, to prove the elements of the crime beyond a reasonable doubt." *State v. Brummett*, 2024-Ohio-2332, ¶ 9 (12th Dist.).

{¶ 27} "A verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it." *State v. Knuff*, 2024-Ohio-902, ¶ 207. This is because, unlike the sufficiency-of-the-evidence standard of review, "'a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion.'" *State v. Casey*, 2024-Ohio-689, ¶ 10 (12th Dist.), quoting *State v. Messenger*, 2022-Ohio-4562, ¶ 26. "To determine whether a conviction is against the manifest weight of the evidence, this court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lewis*, 2020-Ohio-3762, ¶ 18 (12th Dist.), citing *State v. Wilks*, 2018-Ohio-1562, ¶ 168. This court will overturn a conviction on manifest-weight grounds "only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Kaufhold*, 2020-Ohio-3835, ¶ 10 (12th Dist.).

*Aggravated Murder in Violation of R.C. 2903.01(A).*

{¶ 28} Thomas was convicted of aggravated murder in violation of R.C. 2903.01(A), an unclassified felony. That statute prohibits any person from "purposely, and with prior calculation and design," causing the death of another. A person acts "purposely" when "it is the person's specific intention to cause a certain result." R.C. 2901.22(A).

{¶ 29} "The phrase 'prior calculation and design' is not statutorily defined." *State v. Hamrick*, 2023-Ohio-117, ¶ 74 (12th Dist.). However, although not statutorily defined, the Ohio Supreme Court has determined that, in reviewing whether the testimony and evidence presented at trial is sufficient to establish the prior-calculation-and-design element, "a court must consider whether the evidence, when viewed in the light most favorable to the prosecution, supports a finding that [the] defendant acted with advance

reasoning and purpose to kill." *State v. Jones,* 2021-Ohio-3311, ¶ 2. Therefore, as the Ohio Supreme Court has also determined, "[e]vidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 2016-Ohio-8295, ¶ 18.

{¶ 30} "There is no bright-line test for determining whether a defendant's actions show a premeditated decision or studied consideration to kill—each case turns on its own facts." *Jones* at ¶ 17. The Ohio Supreme Court has nevertheless identified three factors as "pertinent considerations" for determining whether there was sufficient evidence of prior calculation and design on the part of the defendant. These three factors are:

> (1) Did the accused and victim know each other, and if so, was that relationship strained?
>
> (2) Did the accused give thought or preparation to choosing the murder weapon or murder site?
>
> (3) Was the act drawn out or an almost instantaneous eruption of events?

*State v. Nicholson*, 2024-Ohio-604, ¶ 52. These three factors are relevant when determining if there was "sufficient time, reflection, and activity" on the part of the defendant to satisfy the prior-calculation-and-design element. *Id.* at ¶ 59 (defendant's decision to shoot and kill his two victims was not made after "mere consideration," but with prior calculation and design, where defendant "returned to his bedroom, where he kept his personal gun" while one of his victims called 9-1-1, "chose to take that gun, loaded," back to the kitchen where his two victims were located, and pursue his two victims as they ran from the house, pulling the trigger of his gun a total of 13 times).

*Thomas' Argument and Analysis*

- 11 -

{¶ 31} Thomas argues the testimony and evidence presented at trial failed to establish that his shooting and killing of Puckett was done with any prior calculation and design. Thomas argues that the testimony and evidence merely establishes that he was "emotionally overwhelmed and reacted impulsively" upon seeing Puckett with another man. Thomas argues that it was this "brief, emotionally charged moment" and "unexpected confrontation" with Puckett and her new boyfriend, Knopp, that caused him to "panic," shooting and killing Puckett as she stood in the doorway to her apartment. However, upon review, we find the record contains overwhelming evidence that clearly establishes Thomas' shooting and killing of Puckett was done with prior calculation and design. That is to say, upon reviewing the evidence in a light most favorable to the prosecution, we find the record plainly reveals that Thomas acted with advance reasoning and purpose to shoot and kill Puckett as alleged in the indictment.

{¶ 32} Thomas – after Puckett had just recently left him – and clad in all black and carrying a loaded handgun, went to Puckett's apartment where she lived with her mother and best friend. Thomas did this approximately three days after having scrawled on the interior wall of his apartment a message stating, "She did what she did that's what happens to hoe stop playin with people emotions, I loved her but she played me… I love all my kids sorry this had to happen." Once there, Thomas laid in wait outside of Puckett's apartment, hidden in the bushes for upwards of 40 minutes before Puckett arrived home. This was just a few hours after Thomas had gotten into an argument with Puckett over the phone and within two hours of Thomas posting to his Facebook page, "Ima pop if you try me I just told you I don't fight people."

{¶ 33} Upon Puckett's arrival home, Thomas emerged from the bushes holding a loaded handgun. After emerging from the bushes, Thomas then confronted Puckett as she stood in the doorway to her apartment. During that confrontation, Thomas stated,

"you bitches thought I was kidding" or "you bitches thought I was playing with you." Thomas then pointed his handgun at Puckett's head and, seemingly ignoring Puckett's pleas for him to stop, pulled the trigger eight times. These eight shots struck Puckett multiple times in various parts of her body. Thomas then fled from the scene, firing one more shot back towards Puckett's apartment where Puckett lay on the floor bleeding and struggling to breathe. As he fled, Thomas discarded both his cellphone and the handgun that he had used to shoot Puckett. Approximately four hours later, Thomas posted on his Facebook page, "I fucked up I'm sorry love u baby girl."

{¶ 34} This evidence, when viewed in a light most favorable to the prosecution, plainly reveals that Thomas acted with prior calculation and design as alleged in the indictment. This is because, as the record clearly establishes, Thomas had ample time to reflect on his actions before making the final decision to shoot and kill Puckett on the morning of June 17, 2023. *See, e.g., State v. Adams*, 2011-Ohio-536, ¶ 26 (12th Dist.) (finding appellant acted with prior calculation and design to support the trial court's verdict finding appellant guilty of aggravated murder in violation of R.C. 2903.01[A] where appellant "had ample time on the day of the shooting to reflect on his actions before he made the final decision to shoot and kill [the victim]"). This holds true even if we were to give credence to Thomas' claim that he had no intention of ever actually shooting Puckett when he went to Puckett's apartment that evening. This is because, as it is now well established, "prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 2001-Ohio-1340, ¶ 59.

{¶ 35} Consequently, regardless of when Thomas' plan to shoot and kill Puckett ultimately came to fruition, Thomas' shooting and killing of Puckett was clearly not committed on the spur of the moment or after a mere momentary consideration. Thomas'

shooting and killing of Puckett was instead made with advanced reasoning and purpose to kill. This is evidenced by, among other things, Thomas scrawling on the interior wall of his apartment approximately three days before the shooting a message stating, "She did what she did that's what happens to hoe stop playin with people emotions, I loved her but she played me… I love all my kids sorry this had to happen." This is also evidenced by the fact that, sometime after writing that message, Thomas then laid in wait outside of Puckett's apartment, hidden in the bushes for upwards of 40 minutes while clad in all black and carrying a loaded handgun. Therefore, because the record contains overwhelming evidence that plainly establishes Thomas' shooting and killing of Puckett was done with prior calculation and design, the trial court's verdict finding Thomas guilty of aggravated murder in violation of R.C. 2903.01(A) was both supported by sufficient evidence and not against the manifest weight of the evidence. Accordingly, Thomas' first assignment of error is overruled.

**Thomas' Second Assignment of Error**

{¶ 36} THE TRIAL COURT ERRED BY RELYING ON IMPROPER CHARACTER EVIDENCE INCLUDING INFLAMATORY SOCIAL MEDIA CONTENT IN ITS DELIVERING OF THE VERDICT.

{¶ 37} In his second assignment of error, Thomas argues the trial court committed plain error by admitting into evidence and thereafter relying upon his "inflammatory Facebook posts" and "cryptic wall inscription" to find him guilty of aggravated murder. To support this claim, Thomas argues that the trial court's admission and reliance upon this evidence was improper and violative of both Evid.R. 404(B) and 403(A). This is because, according to Thomas, "these writings were speculative, emotionally charged, and lacked clear probative value" on the issue of his prior calculation and design to shoot and kill Puckett. We disagree.

*Plain Error Standard of Review*

{¶ 38} "When properly objected to, this court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard." *State v. Ruth*, 2020-Ohio-4506, ¶ 11 (12th Dist.). Thomas, however, did not object to the admissibility of any of the challenged testimony or evidence for which he now complains. "When a defendant fails to object, or fails to object at trial on the specific ground raised on appeal, the reviewing court is limited to a plain-error analysis." *State v. Singh*, 2022-Ohio-3385, ¶ 43 (12th Dist.). Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "An error does not rise to the level of a plain error unless, but for the error, the outcome of the trial would have been different." *State v. Barahona-Lara*, 2024-Ohio-3048, ¶ 45 (12th Dist.).

{¶ 39} "'Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Harner*, 2020-Ohio-3071, ¶ 24 (12th Dist.), quoting *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990). "That is to say, a finding of plain error is made only in the extremely rare case where [the] error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *State v. Jewell*, 2022-Ohio-2727, ¶ 24 (12th Dist.). "'The burden of demonstrating plain error is on the party asserting it.'" *State v. Downing*, 2024-Ohio-381, ¶ 36 (12th Dist.), quoting *State v. Quarterman*, 2014-Ohio-4034, ¶ 16.

*The Admissibility of Other-Acts Evidence at Trial*

{¶ 40} "Evid.R. 402 generally establishes that all relevant evidence is admissible." *State v. Thompson*, 2014-Ohio-4751, ¶ 180. Evid.R. 401 defines "relevant evidence" to

mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." There are exceptions to this rule, however. *See State v. Terry*, 2023-Ohio-3131, ¶ 7 (1st Dist.). One such exception is set forth in Evid.R. 404(B), which "codifies the common law with respect to evidence of other acts of wrongdoing." *State v. Morris*, 2012-Ohio-2407, ¶ 13.

{¶ 41} "Evid.R. 404(B) does not contain a blanket prohibition on the introduction of other-acts evidence." *State v. Echols*, 2024-Ohio-5088, ¶ 30. Rather, pursuant to Evid.R. 404(B)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." "This type of evidence is commonly referred to as 'propensity evidence' because its purpose is to demonstrate that the accused has a propensity or proclivity to commit the crime in question." *State v. Hartman*, 2020-Ohio-4440, ¶ 21.

{¶ 42} However, in accordance with Evid.R. 404(B)(2), evidence of any other crime, wrong, or act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *Hartman* at ¶ 22. "Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Id.* Whether the evidence was presented for a nonpropensity-based purpose is a question of law that we review de novo. *Echols.* "De novo means this court will afford no deference to the trial court's decision." *State v. Dean*, 2022-Ohio-3105, ¶ 27 (12th Dist.), citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8.

{¶ 43} The question of whether other-acts evidence was admissible at trial does not end there, however. To be admissible, the evidence must also satisfy the requirements of Evid.R. 403(A). *See State v. Edwards*, 2023-Ohio-2632, ¶ 48 (12th Dist.). Pursuant to that rule, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evidence is not unfairly prejudicial simply because it is unfavorable to the defendant. *State v. Hall*, 2022-Ohio-1147, ¶ 197 (12th Dist.). Logically, all evidence presented by the prosecutor is unfavorable to the defendant, thereby rendering it prejudicial. *State v. White*, 2019-Ohio-4312, ¶ 31 (12th Dist.), citing *State v. Skatzes*, 2004-Ohio-6391, ¶ 107.

{¶ 44} "But not all evidence *unfairly* prejudices a defendant." (Emphasis in original.) *Hall*. It is only evidence that unfairly prejudices the defendant that must be excluded under Evid.R. 403(A). "Unfairly prejudicial evidence is that which might result in an improper basis for a verdict." *State v. Cooper*, 2002-Ohio-617, ¶ 57 (12th Dist.). "Consequently, evidence that arouses emotions, evokes a sense of horror, or appeals to an instinct to punish may be unfairly prejudicial." *Id.* "We review a trial court's Evid.R. 403(A) decision for an abuse of discretion." *State v. Smith*, 2020-Ohio-4441, ¶ 50. "The term 'abuse of discretion' . . . implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Hancock*, 2006-Ohio-160, ¶ 130.

*Thomas' Argument and Analysis*

{¶ 45} As noted above, Thomas argues the trial court committed plain error by admitting into evidence and thereafter relying upon his "inflammatory Facebook posts" and "cryptic wall inscription" to find him guilty of aggravated murder. However, upon review, we find this evidence was certainly relevant and admissible under Evid.R. 404(B) to establish Thomas' motive, intent, preparation, and plan to shoot and kill Puckett as

alleged in the indictment. This is because, so long as they are close in time to the criminal act in question, "prior threats to commit a criminal act are admissible where they are directly related to proof of motive, intent, preparation, and plan" under Evid.R. 404(B). *State v. Rice*, 2004-Ohio-697, ¶ 19 (12th Dist.), citing *State v. Sargent*, 126 Ohio App.3d 557, 568 (12th Dist.1998). Such is the case here.

{¶ 46} We also find nothing about this evidence to be unfairly prejudicial to Thomas that would require its exclusion under Evid.R. 403(A). This is particularly true in this case when considering Thomas was found guilty following a bench trial. "[J]udges, unlike juries, are presumed to consider only relevant evidence." *State v. Herring*, 2002-Ohio-796, ¶ 118. Consequently, "in an appeal from a bench trial, we presume that a trial court only relies on relevant, material, and competent evidence in arriving at its judgment." *State v. Shropshire*, 2016-Ohio-7224, ¶ 37 (8th Dist.), citing *State v. Eley*, 1996-Ohio-323, ¶ 35. This holds true even in appeals where the appellant has been convicted of aggravated murder. *See State v. Maxey*, 2024-Ohio-1279, ¶ 56 (8th Dist.). Therefore, finding the trial court did not err, plain or otherwise, Thomas' second assignment of error also lacks merit and is overruled.

**Thomas' Third Assignment of Error**

{¶ 47} THE TRIAL COURT ERRED IN ORDERING THAT THE PRISON TERMS BE SERVED CONSECUTIVELY.

{¶ 48} In his third assignment of error, Thomas argues the trial court erred by ordering the prison sentences he received for aggravated murder and discharging a firearm at or into a habitation to be served consecutively. To support this claim, Thomas argues the trial court failed to make the necessary consecutive sentence findings as required by R.C. 2929.14(C)(4) before ordering those sentences to be served consecutively. More specifically, Thomas argues that while the trial court may have

intended to make a finding under R.C. 2929.14(C)(4)(b) before imposing consecutive sentences, the trial court nevertheless failed to do so. Therefore, because the trial court failed to make the necessary consecutive sentence findings as required by R.C. 2929.14(C)(4), Thomas argues that this court should reverse the trial court's decision and remand this matter to the trial court for the limited purpose of resentencing. We agree.

*Imposition of Consecutive Sentences Under R.C. 2929.14(C)(4)*

{¶ 49} Pursuant to R.C. 2929.14(C)(4), to impose consecutive sentences, the trial court must find (1) that the imposition of consecutive sentences is necessary to protect the public from future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that at least one of the three conditions described in R.C. 2929.14(C)(4)(a), (b), or (c) apply. *State v. Holon*, 2025-Ohio-2725, ¶ 40 (12th Dist.) Those three conditions being:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 50} The imposition of consecutive sentences is contrary to law where the trial court fails to make the necessary consecutive sentencing findings required by R.C. 2929.14(C)(4). *State v. Ward*, 2024-Ohio-2858, ¶ 14 (12th Dist.). Such failure requires the

- 19 -

trial court's imposition of consecutive sentences be reversed and the matter remanded to the trial court for the limited purpose of resentencing. *See, e.g., State v. Brown*, 2024-Ohio-4450, ¶ 16-17 (12th Dist.) (reversing a trial court's imposition of consecutive sentences and remanding the matter to the trial court for the limited purpose of resentencing where the trial court failed to make the necessary consecutive sentence findings required by R.C. 2929.14[C][4] before sentencing appellant to consecutive sentences).

*Thomas' Argument and Analysis*

{¶ 51} Upon review, we find merit to Thomas's argument. This is because, while the trial court may have intended to make a finding under R.C. 2929.14(C)(4)(b), the trial court nevertheless failed to do so. Rather, as the trial court stated when ordering the prison sentences Thomas received for aggravated murder and discharging a firearm at or into a habitation to be served consecutively:

> I am going to order that these sentences be served consecutively, that means one after another because I think a consecutive sentence is necessary to properly punish you, to protect the public. The overall sentence is not disproportionate to the conduct involved here or the danger posed by you . . . so we're looking at basically life imprisonment with a possibility of parole eligibility after forty years.

{¶ 52} As can be seen, a finding under R.C. 2929.14(C)(4)(b) is clearly missing from the trial court's consecutive sentence findings. Therefore, finding merit to Thomas' argument, Thomas's third assignment of error is sustained, the trial court's imposition of consecutive sentences is reversed, and this matter is remanded to the trial court for the limited purpose of resentencing. "On remand, the trial court shall consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4), and if so, make the required statutory findings on the record at resentencing and incorporate its findings into

a sentencing entry." *Brown*, 2024-Ohio-4450, at ¶ 17. Thomas' conviction in all other respects is affirmed.

{¶ 53} Judgment affirmed in part, reversed in part, and remanded for the limited purpose of resentencing.

M. POWELL and SIEBERT, J., concur.

---

# J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed in part, reversed in part, and remanded for the limited purpose of resentencing in accordance to the law and consistent with the Opinion filed the same date as this Judgment Entry. In all other respects, the judgment of the trial court is affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 67% to appellant and 33% to appellee.

/s/ Robin N. Piper, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge