[Cite as *State v. Mills*, 2026-Ohio-2356.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2025-09-073 |
| vs. | : | OPINION AND JUDGMENT ENTRY 6/22/2026 |
| DUSTIN L. MILLS, | : | |
| Appellant. | : | |
| | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2024 CR 0614


Mark J. Tekulve, Clermont County Prosecuting Attorney, and Zachary K. Garrison, Assistant Prosecuting Attorney, for appellee.

Schuh & Goldberg, LLP, and Brian T. Goldberg, for appellant.


## O P I N I O N


**PIPER, P.J.**

{¶ 1} Appellant, Dustin L. Mills, appeals his conviction in the Clermont County Court of Common Pleas after a jury found him guilty of one count of attempted murder

and two counts of felonious assault, for which he was ultimately sentenced to serve an indefinite term of nine to 13 and one-half years in prison. For the reasons outlined below, we affirm Mills's conviction.

**Facts and Procedural History**

{¶ 2} On October 3, 2024, the Clermont County Grand Jury returned an indictment charging Mills with one count of first-degree felony attempted murder and two counts of second-degree felony felonious assault.[1] The charges stemmed from allegations that Mills had stabbed and nearly killed his supposed longtime close friend, Tommy Aldridge, late in the afternoon or early evening hours of September 26, 2024. The alleged stabbing occurred both inside Aldridge's car and in the surrounding areas outside of Aldridge's car while the car was parked in the driveway of Mills's home located in Amelia, Clermont County, Ohio. Mills was subsequently arraigned and entered a not guilty plea to all three charges. Bond was set at $500,000.

*The Bill of Particulars*

{¶ 3} On October 16, 2024, the State filed a bill of particulars. Regarding all three charges, the bill of particulars alleged that while Aldridge was dropping Mills off at his home, Mills approached Aldridge, seemingly wanting to give Aldridge a hug. However, rather than giving Aldridge a hug, Mills instead pulled out a knife and began stabbing Aldridge. The bill of particulars alleged that Mills stabbed Aldridge a total of eight times "in the face, neck, torso, and legs." The bill of particulars also alleged that the knife Mills supposedly used to stab Aldridge "barely miss[ed]" several of Aldridge's "vital organs, veins, and arteries," "nearly causing [Aldridge] to die due to the stab wounds."

---

1. The one count of attempted murder was prosecuted as a violation of R.C. 2923.02(A) and 2903.02(A), whereas the two counts of felonious assault were prosecuted as violations of R.C. 2903.11(A)(1) and 2903.11(A)(2), respectively.

{¶ 4} Continuing, the bill of particulars alleged that Mills, sometime after the stabbing had occurred, "confessed to an associate that he had stabbed [Aldridge] and made other incriminating comments." The bill of particulars further alleged that a knife matching the description of the weapon Mills had purportedly used to stab Aldridge was found in a backpack among Mills's property. This was in addition to the bill of particulars alleging that, in the time leading up to when Mills had supposedly stabbed Aldridge, Mills had been "using drugs" and making "several comments" about "wanting to stab and/or kill someone."

*The Four-Day Jury Trial*

{¶ 5} On July 21, 2025, the matter proceeded to a four-day jury trial. During the trial, the jury heard testimony from eight witnesses. This included testimony from the alleged victim in this case, Aldridge. The following is a summary of Aldridge's trial testimony.

<u>Summary of Aldridge's Trial Testimony</u>

{¶ 6} Aldridge testified that on the day in question, September 26, 2024, he got off work around 2:00 or 3:00 p.m. and went to pick up a friend, Mikala Newberry, with whom he had been messaging on Facebook. Aldridge testified that after picking up Newberry at her house in Mt. Orab, the plan was to take Newberry to Mills's house in Amelia so that she could sell Mills a motorcycle helmet that "she was trying to get rid of."[2] Aldridge testified that he and Mills had at that time known each other for "a really long time, probably around ten years." Aldridge also testified that he considered Mills to be one of his closest friends, and that they would "hang out" and smoke marijuana together "maybe once or twice a week or so, sometimes not that much, sometimes more." Aldridge

---

2. Mt. Orab is a small village of approximately 4,300 residents located in Brown County, Ohio.

further testified that, prior to picking up Newberry at her house that day, he was unaware that she and Mills were also acquainted and were "friends or knew each other or whatever."

{¶ 7} Aldridge testified that he and Newberry arrived at Mills's house sometime between 4:00 and 5:00 p.m. Upon arriving at Mills's house, Aldridge testified that he, Newberry, and Mills "kind of all greeted each other" before going into a shed on Mills's property, where they smoked marijuana for approximately one hour. Aldridge testified that during this time Mills, as he often did, was either messing with or fiddling around with his motorcycle or "you know with knives or, I don't know, just anything close by." Aldridge testified that this included Mills "[l]ike scratching at the floor or, you know, I don't know, not hundred percent sure. He would often fiddle with like just whatever is close or whatever, I guess." Thereafter, when asked whether he specifically remembered Mills having a knife with him in the shed that day, Aldridge testified, "Yes."

{¶ 8} After smoking marijuana for about an hour, Aldridge testified that he drove Newberry and Mills "just a couple [of] minutes down the road" to a nearby lake with a "beach area." Once there, Aldridge testified that he, Newberry, and Mills exited his vehicle and walked down toward the lake. Upon reaching the lake, Aldridge testified that Mills jumped into the water with his clothes on, only to get out a few seconds later, "long enough to jump in and jump right back out." Aldridge testified that Mills's jumping into the lake was somewhat unusual, given that it was noticeably "chilly" that day. Aldridge testified that he was nevertheless "[n]ot too surprised" because Mills "often did things like that."

{¶ 9} Aldridge testified that, once Mills made his way out of the lake, he offered Mills "a jacket to wear because he seemed pretty cold, and then we drove back to his house." Aldridge testified that he did so because Mills "was wet and I assume probably wanted a change of clothes . . . because I'm sure he was probably pretty cold." Aldridge

- 4 -

testified that nothing unusual happened on the drive back to Mills's house and that, although Mills had seemed a little irritated when he and Newberry had first arrived at his house earlier that afternoon, they were not arguing and had not been arguing at all that day.

{¶ 10} Aldridge testified that after spending "roughly half an hour to an hour maybe" at Mills's house, he told Mills that he and Newberry were getting ready to leave for his apartment so that he could change out of his work clothes. After notifying Mills of their plan to leave, Aldridge testified that Mills hugged Newberry while she was seated in the front passenger seat of his car. Aldridge testified that Mills then:

> walked to my side of the car when I was in the driver's seat with the seat belt on. And I think I even had the car in reverse already, but he walked up and I put my foot on the brake. And he acted like he was going to hug me and then began to stab me. I think he put one arm around me and then used the other arm to stab.

{¶ 11} Aldridge testified that he did not initially realize that Mills had stabbed him, thinking Mills was just "messing around" and had simply "charlie horsed" him or punched him. However, upon realizing that he had been stabbed, Aldridge testified that he "started trying to kind of push and kick at [Mills] as much as [he] could to get [Mills] away from [him]." Aldridge testified that after kicking Mills away, Mills then "ran around the other side of the car and hopped in the passenger seat," where Newberry had been sitting, and "kept trying to stab [him]." Explaining where Newberry had gone, Aldridge testified that "she had hopped out to try to help pull [Mills] off of [him] or something," and had then moved back behind his car as he attempted to back out of Mills's driveway "because I know I almost hit her because I didn't realize she was back there."

{¶ 12} Aldridge testified that it was at this time that Mills, who by then had "kind of got worn out himself," stopped his attack and got out of the car. Aldridge testified that

after Mills exited the car, Mills then yelled out "don't call the cops" and threatened Newberry, saying "she would be next." Aldridge testified that Newberry then got back into his car and that he drove them both to his apartment. Aldridge testified that it was only after he got back to his apartment, and after Newberry had called for an ambulance, that he realized the severity of his injuries. As Aldridge testified:

> Yeah, I know the first one [hurt], I didn't really feel the other ones until I had got back to my apartment, but the first one was the only one, was the only one I like felt in the moment, I guess because of adrenaline or whatever.

{¶ 13} Aldridge, although acknowledging that he had initially lied to the police and the doctors who were treating him for his injuries by saying he had been attacked by a stranger at a gas station, testified that it was Mills who had stabbed him, first in his left side, then in his ribs, neck, and right knee, and finally above his left eyebrow. Aldridge testified that he did not remember Mills saying anything to him during the attack. Aldridge also testified that he did not know what caused Mills to attack him with a knife that day. Aldridge did testify, however, to seeing the "tip of the blade" of the knife that Mills had used to stab him. Describing the blade, Aldridge testified that it was "obviously silver metal, it was one-sided and like it wasn't sharpened on both sides of the blade or whatever, just the one side was sharp." Aldridge testified that the blade was like the one depicted in State's Exhibit 10A, a photograph of a knife that was later found in a backpack among Mills's property.

*The Jury's Verdict and Sentencing*

{¶ 14} On July 25, 2025, the jury returned a verdict finding Mills guilty of all three charges for which he had been tried, one count of attempted murder and two counts of felonious assault. The following month, on August 28, 2025, the trial court held a sentencing hearing. At sentencing, the trial court merged all three offenses as allied

offenses of similar import. Following the trial court's merger, the State elected to proceed with sentencing on the attempted murder charge. Upon the State's election, the trial court then sentenced Mills to an indefinite term of nine- to 13-and-one-half years in prison, less 336 days of jail-time credit. The trial court also ordered Mills to pay court costs and notified Mills that he would be subject to a mandatory minimum two-year postrelease control term, with a maximum postrelease control term of up to five years, upon his release from prison.

**Mills's Appeal and Four Assignments of Error**

{¶ 15} On September 18, 2025, Mills filed a notice of appeal. Following the parties' briefing, Mills's appeal was submitted to this court for consideration on May 13, 2026, and is now properly before this court for decision. To support his appeal, Mills has raised four assignments of error for review. We will address each of Mills's four assignments of error in turn.

*Mills's First Assignment of Error*

{¶ 16} APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL JUDGE COMMENTED DURING VOIR DIRE ABOUT THE EVIDENCE THAT WOULD BE OFFERED AT TRIAL.

{¶ 17} In his first assignment of error, Mills argues that the trial court judge denied him his right to a fair trial by improperly interjecting himself into the voir dire proceedings and offering his take on the State's evidence that would be presented at trial. More specifically, Mills argues that it was improper for the trial judge, when attempting to clarify a hypothetical offered by the State during its voir dire of a would-be juror, to ask that juror whether he believed it was possible to find a defendant guilty of stabbing someone with a knife when the knife that the defendant purportedly used had never been found.

{¶ 18} To support this argument, Mills directs our attention to the trial judge's comments made during that portion of the voir dire proceedings. As the judge stated:

THE COURT: Before you sit I want to follow up your question a little bit and make sure that he is understanding about a missing weapon. So, I think the questioning started that if the prosecutor is able to present direct witness testimony that they saw X Y and Z happen but they can't find the gun, if one witness said, I saw Mr. Jones shoot Mr. Johnson, but they can't find the gun, and you believe Mr. Jones, is that enough for you to convict the person of shooting someone?

{¶ 19} Continuing, the judge stated:

THE COURT: If all the elements were proven, but they can't find the weapon for whatever reason, it's in somebody's yard, it got thrown in a lake, but they don't know, they just can't find the weapon, but somebody testified, I think [that is] what the prosecutor is trying to ascertain because there is no knife? Let's just call a spade a spade. . . . Let's call a spade a spade here, there is no knife here, so they want to make sure that if there is enough independent witnesses or a witness to say, this is what I saw, that if you're convinced that is what they saw that you might think about where is the knife, but is that going to keep you from making a decision?

{¶ 20} To this, the would-be juror responded, "It would not." The judge then asked the State whether its clarification was "kind of what" it was trying to get at, since it "kind of went back and forth." The State responded, "Yes." The following exchange then occurred:

[THE STATE]: Your Honor, there is a knife we just don't know if it is THE knife, I should say, and that is what we were getting at.

THE COURT: Okay, fair enough. We have knives, but is it THE knife. So if you're not sure it's THE knife then you're not going to present it as THE knife, which means people are going to say, where is the knife, like where is the beef.

[THE STATE]: Yes.

THE COURT: You know there is, but that alone I think the prosecutor is trying to establish the missing knife, if there is evidence to support what they are trying to prove you might wonder where it is, but that is not going to keep you from making a decision?

[WOULD-BE JUROR #1]: Correct.

- 8 -

{¶ 21} Mills also claims that it was improper for the trial court judge to interject during his trial counsel's voir dire of a different would-be juror, stating:

> [DEFENSE COUNSEL]: So, again, it's kind of the same question but I just want to ask it in a different way, [the State] was asking about not having the alleged knife. Would you need other evidence, physical evidence to convict an individual of a crime they were charged with?
>
> [WOULD-BE JUROR #2]: If there is no knife?
>
> [DEFENSE COUNSEL]: Correct.
>
> [WOULD-BE JUROR #2]: Then I would hope that there would be evidence from a witness of some other source.
>
> [DEFENSE COUNSEL]: What type of evidence, what would you want to hear, want to see?
>
> [WOULD-BE JUROR #2]: I'm not sure, a witness would go a long way.
>
> [DEFENSE COUNSEL]: So you would rely more on testimony evidence than physical evidence?
>
> THE COURT: Let me just add, I think we are leaving out that there is probably going to be evidence of stab wounds, you know what I mean, but that is the problem he is getting that on purpose.

{¶ 22} To this, Mills's trial counsel stated, "I don't mean to cut you off, I'm trying to stay away from the allegations," to which the trial judge replied:

> THE COURT: I know, I'm not, because I want to keep this moving and I think it's unfair, not just you, even [the State] with [would-be juror #1], it's like you get them to say what you don't want them to say if you don't give them all the context. And I just want to give them context because if with context he says there is no way I'm going to convict or no way I'm going to believe then we got a problem. But with context then I want to hear their answers with context versus, you know, just bits and pieces. So, give them what you think you got.
>
> [DEFENSE COUNSEL]: All due respect I think that is what I am trying to do.

THE COURT: I'm not lecturing, I'm just trying, I am listening to all of these questions and I am like how do you answer that.

[DEFENSE COUNSEL]: I'm giving them the most that I can, I mean if there is not evidence there.

THE COURT: Okay. If this is all you got, okay, I got you. But they don't know that.

[DEFENSE COUNSEL]: If that is all that the State has, does that change your mind? . . . Not having a possible weapon, right, I'm asking does that change, if you're wanting to see more evidence and there isn't any more evidence how does that weigh on your ability to, I guess, would you still be able to come to a conclusion?

[WOULD-BE JUROR #2]: Yes.

{¶ 23} Mills argues that the trial judge's comments about the presence or absence of a knife and the existence of stab wounds on Aldridge's body as evidence in this case "almost certainly highlighted their importance and weight with the jury," thereby denying him his right to a fair trial. We disagree.

{¶ 24} There can be no dispute that, in presiding over a trial, "the judge must be cognizant of the effect of his comments upon the jury." *State v. Wade*, 53 Ohio St.2d 182, 187 (1978), *vacated on other grounds*, *Wade v. Ohio*, 438 U.S. 911 (1978). A trial court judge must also be mindful that his or her influence "on the jury is necessarily and properly of great weight." *Starr v. United States*, 153 U.S. 614, 626 (1894). This is why trial judges are to "remain impartial and refrain from making comments that could influence a jury to the prejudice of the defendant." *State v. McAlpin*, 2022-Ohio-1567, ¶ 210, citing *State v. Boyd*, 63 Ohio App.3d 790, 794 (8th Dist. 1989).

{¶ 25} In *McAlpin*, the Ohio Supreme Court determined that, "[w]hen reviewing a claim that a trial judge made improper remarks that prejudiced the defendant, we [are to] apply the following rules:"

(1) The burden of proof is placed upon the defendant to

- 10 -

demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, [with] (4) consideration [] given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.

(Bracketed text in original.) *Id*. at ¶ 211, quoting *Wade*, 53 Ohio St.2d at 188.

{¶ 26} Upon review, and when applying the aforementioned rules to the case at bar, we question the trial judge's underlying reason for interjecting into the voir dire proceedings in this case. The parties' voir dire questioning of the would-be jurors— including the State's hypothetical directed at one of those jurors, asking whether he believed it was possible to find a defendant guilty of stabbing someone with a knife when the actual knife that the defendant purportedly used had never been found—was not overly taxing or difficult to understand. There was also no objection raised by either party challenging whether opposing counsel was engaged in improper voir dire questioning of the would-be jurors by impermissibly wading into the facts of the case.

{¶ 27} "Voir dire serves the purposes of allowing the court and the parties to identify and remove jurors to ensure an impartial jury." *State v. Froman*, 2020-Ohio-4523, ¶ 49. This is why, when conducting their respective voir dire questioning of potential jurors, the "parties may explain circumstances of the offense to determine if prospective jurors have knowledge of the offense or have biases that might impact their fitness to serve on the jury." *State v. Holman*, 2026-Ohio-1793, ¶ 27 (1st Dist.). "Techniques and decisions regarding juror voir dire are subjective and based upon each attorney's trial strategy." *State v. Munn*, 2009-Ohio-5879, ¶ 32 (6th Dist.). There are, in fact, "'[f]ew decisions at trial [that] are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors.'" *State v. Mundt*, 2007-Ohio-4836, ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001).

{¶ 28} That said, as at least one other court has emphasized, "[w]e are constrained to express our concern about intemperate remarks by members of the trial bench in connection with voir dire examination." *Summers v. State*, 725 P.2d 1033, 1040 (Wyo. 1986). And we must do so here. The trial court judge should not have interjected himself into the voir dire proceedings in this case. While seemingly well-intended, the trial judge's comments were unnecessary and served no real purpose, other than to create an arguable issue for Mills to raise on appeal. Mills, however, has not established any resulting prejudice from the judge's comments. This is because, prompted by Mills's objection, the judge mitigated any impact that his comments may have had on the would-be jurors by providing them with the proper context in which his comments had been made, stating:

> THE COURT: Ma'am? So, what we have been talking about is there is some concern about some of the things that I may have said about whether there is a knife or not whether there is stab wounds. I don't know if there are, I don't know if there is a knife, I was just trying – I felt like the questions were so vague that we were going to be here much longer trying to pull out of you folks, who don't do this every day, what else do you need to see, what else do you need to see. And so I was trying to help along. The concern is that if it came out of my mouth you all think that it's true. And I have no idea if there are stab wounds. I have no idea if there is a knife. I don't. And I want to make sure that you understand that my ability to give you context, so that it would help answer the questions. I think someone was asked what else would you need to see if there wasn't a knife. Do you remember being asked that? Do you remember who asked you that, sir?
>
> JUROR: No, I don't.
>
> THE COURT: Okay. And so, I think you were like well, I don't know, I can't think of anything. And so, I don't know if there are stab wounds or a knife, whether the knife matches or doesn't, no idea. So we want to make sure that you all are not leaning on what I said because I am the Judge, because I have no idea how this is all going to play out.
>
> JUROR. Because the trial hasn't began yet.

THE COURT: Hundred percent. So if I told you that I had granola and yogurt this morning I wouldn't believe it either. Yeah, okay, just want to make sure everybody understands it's all going to be under oath and then you take that, that's why we got into the credibility. Does everybody understand all that, everybody good with it? Does anybody feel like I said something that makes them feel like I know the answer without knowing the answer? If you do just say it. Okay. All right.

{¶ 29} The trial judge also instructed the jury, prior to the parties' opening statements, that it was to "consider and decide this case only upon the evidence received at the trial." This is in addition to the judge instructing the jury, after both parties had rested their respective cases, that it was the jury who was to decide, from all of the direct and circumstantial evidence taken together, whether the State had proven Mills's guilt beyond a reasonable doubt with respect to each of the three charges that he was being tried, one count of attempted murder and two counts of felonious assault. "Evidence," as defined for the jury by the trial court judge in this case, meaning "all the testimony received from the witnesses and the exhibits admitted during the trial, and any facts that the court [had] require[d] [it] to accept as true."

{¶ 30} We are to presume that the jury followed the trial judge's instructions. *McAlpin*, 2022-Ohio-1567 at ¶ 226, citing *State v. Garner*, 1995-Ohio-168. Mills has cited no evidence to rebut that presumption, and nothing within the record leads us to dispense with that presumption. *See, e.g., State v. Treece*, 2025-Ohio-4319, ¶ 22 (3d Dist.) (noting that, as an intermediate appellate court, it was to "presume that a jury followed the trial court's instructions," where there was nothing in the record that would lead it to "dispense with this presumption"). Therefore, while we believe it would have been better practice for the trial court judge not to have interjected himself into the voir dire proceedings in this case, Mills's argument that the trial court judge denied him his right to a fair trial by

improperly interjecting himself into the voir dire proceedings lacks merit because Mills cannot establish that he suffered any resulting prejudice from the judge's comments. Accordingly, Mills's first assignment of error is overruled.

*Mills's Second Assignment of Error*

{¶ 31} THE TRIAL COURT COMMITTED PLAIN ERROR BY PERMITTING IMPROPER "OTHER ACTS" EVIDENCE.

{¶ 32} In his second assignment of error, Mills argues that the trial court committed plain error by admitting improper "other-acts" evidence at his trial.[3] To support this argument, Mills claims that it was plain error for the trial court to admit evidence that indicated he always carried with him and had a knife of some kind on his person. Specifically, testimony that "[a]lmost every day he had a pocketknife on him," that "today it might be a blue one, tomorrow it might be a green one and the next day it could be a red one," that "[h]e had a back pack that he was carrying knives in there at one time," and that when he "went fishing he would occasionally carry one about a foot long, a fishing knife that you would consider a filet knife." We disagree.

{¶ 33} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." This rule imposes three limitations on this court's ability to correct an error not otherwise raised below. *State v. Garrett*, 2022-Ohio-4218, ¶ 63. "To demonstrate plain error, an appellant must show (1) that there was an error, (2) that the error was 'plain,' i.e., obvious, and (3) that the error affected the appellant's 'substantial rights,'" *State v. Drain*, 2022-Ohio-3697, ¶ 52, which the Ohio Supreme Court has "interpreted to mean that the error affected the

---

3. Normally, this court "will not reverse a trial court's decision regarding the admission of evidence absent an abuse of discretion." *State v. Buell*, 2016-Ohio-5477, ¶ 32 (12th Dist.). In this case, however, Mills expressly acknowledges that he did not object to the admission of this so-called "other-acts" evidence at his trial. By failing to object, Mills concedes that he has forfeited all but plain error on appeal. *See State v. Powers*, 2024-Ohio-1521, ¶ 8 (12th Dist.).

outcome of the trial." *State v. Brinkman*, 2022-Ohio-2550, ¶ 45.

{¶ 34} "The elements of the plain-error doctrine are conjunctive: all three must apply to justify an appellate court's intervention." *State v. Bailey*, 2022-Ohio-4407, ¶ 9. It is the second part of this three-part test that "gives teeth" to the Ohio Supreme Court's directive for this court to apply the plain-error doctrine only in those exceptionally rare cases where it is necessary to prevent a manifest miscarriage of justice. *Id*. at ¶ 15, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus ("[n]otice of plain error under Crim.R. 52[B] is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice"). "A manifest miscarriage of justice occurs in a criminal trial when it appears a substantial prejudice would be imposed on the defendant without a reversal." *State v. Maddox*, 1995 Ohio App. LEXIS 4923, *8 (1st Dist. Nov. 8, 1995), citing *State v. Adams*, 62 Ohio St.2d 151 (1980).

{¶ 35} Evid.R. 404(B) "codifies the common law with respect to evidence of other acts of wrongdoing." *State v. Morris*, 2012-Ohio-2407, ¶ 13. The rule "does not contain a blanket prohibition on the introduction of other-acts evidence." *State v. Echols*, 2024-Ohio-5088, ¶ 30. Rather, pursuant to Evid.R. 404(B)(1), evidence of any other crime, wrong, or act is deemed inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." "This type of evidence is commonly referred to as 'propensity evidence' because its purpose is to demonstrate that the accused has a propensity or proclivity to commit the crime in question." *State v. Hartman*, 2020-Ohio-4440, ¶ 21.

{¶ 36} However, in accordance with Evid.R. 404(B)(2), such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." "The key is that the evidence must prove something other than the defendant's disposition to commit certain

- 15 -

acts." *Hartman* at ¶ 22. "Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Id*.

{¶ 37} It is generally not a crime, nor is it a wrong, for a person to always carry with them or have a knife on their person. However, evidence that a person always carries or has a knife is inadmissible under Evid.R. 404(B)(1) to prove a person's character and show that, on a particular occasion, the person acted in accordance with that character. That is, so long as the act in question is not otherwise admissible as probative evidence of one of the separate, nonpropensity-based reasons set forth in Evid.R. 404(B)(2). Therefore, while evidence that a defendant always carries with them or has a knife on their person is not admissible to establish that the defendant had a propensity to stab people, particularly as it relates to the common variety pocketknife, such evidence may be admissible as probative evidence for other, nonpropensity-based purposes.[4]

{¶ 38} Upon review, we find that the evidence presented in this case, evidence that indicated Mills always carried with him and had some kind of knife on his person, was admissible as probative evidence to prove at least one, if not more, of those separate, nonpropensity-based purposes outlined in Evid.R. 404(B)(2). This includes as proof that Mills had the opportunity to stab Aldridge with a knife, as alleged by the State. This also includes as proof that the stabbing was neither a mistake nor an accident, but rather something that Mills had prepared for and planned with the requisite intent necessary to kill Aldridge. Therefore, because the evidence that Mills alleges the trial court committed plain error by admitting was, in fact, admissible as evidence under Evid.R. 404(B)(2), Mills has failed to show that an error had occurred in this case, plain or otherwise. Accordingly,

---

4. "A pocketknife is not presumed to be a weapon." *State v. Kimbro*, 1996 Ohio App. LEXIS 1781, *6 (9th Dist. May 1, 1996).

Mills's second assignment of error is also overruled.

*Mills's Third Assignment of Error*

{¶ 39} THE TRIAL COURT ERRED TO THE PREJUDICE OF MR. MILLS'S SIXTH AMENDMENT RIGHTS BY ENTERING JUDGMENT OF CONVICTION AFTER A TRIAL AT WHICH HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL FOR HIS DEFENSE.

{¶ 40} In his third assignment of error, Mills argues that his trial counsel provided him with ineffective assistance by failing to object to the admissibility of the so-called "other acts" evidence addressed above in our discussion of Mills's second assigned error. However, given our previous holding overruling that assignment of error, which found that the evidence Mills alleged the trial court committed plain error by admitting was, in fact, admissible as evidence under Evid.R. 404(B)(2), Mills's ineffective assistance of counsel claim arguing that his trial counsel was ineffective for failing to object to that evidence's admissibility must also fail. Therefore, Mills's third assignment of error is likewise overruled.

*Mills's Fourth Assignment of Error*

{¶ 41} MR. MILLS'S CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ARE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 42} In his fourth assignment of error, Mills argues that the jury's verdict finding him guilty of attacking and attempting to kill Aldridge was not supported by sufficient evidence and was against the manifest weight of the evidence. To support these claims, Mills notes that Aldridge initially told the police and the doctors treating him for his injuries that he did not know the identity of his attacker, claiming it was instead a stranger who had attacked him at a gas station. According to Mills, Aldridge's failure to immediately identify him as the perpetrator raises serious questions about Aldridge's overall credibility

and whether Aldridge's subsequent identification of him as the culprit "can be trusted," given that Aldridge had told "two completely different stories" about the attack, only one of which included Mills.

{¶ 43} Despite the wording of this assignment of error, Mills's argument does not raise a sufficiency-of-the-evidence challenge, asserting that the State failed to meet its burden of production. *State v. Thomas*, 2025-Ohio-4895, ¶ 26 (12th Dist.). Mills's argument challenges only whether the State met its burden of persuasion. *State v. Lindhorst*, 2026-Ohio-72, ¶ 29 (12th Dist.). "[T]he manifest-weight-of-the-evidence standard of review applies to the State's burden of persuasion." *State v. McCollum*, 2026-Ohio-393, ¶ 13 (12th Dist.), citing *State v. Messenger*, 2022-Ohio-4562, ¶ 26. Therefore, given that Mills's argument is limited in its challenge to the jury's verdict as being against the manifest weight of the evidence, so too will this court's discussion and analysis of this assignment of error.

{¶ 44} When determining whether a jury's verdict is against the manifest weight of the evidence, this court, sitting as the "thirteenth juror," first reviews the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses who testified at trial. *State v. Brown*, 2025-Ohio-2804, ¶ 30. Following this review, we then determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice that requires reversal of the jury's verdict and ordering a new trial. *State v. Jordan*, 2023-Ohio-3800, ¶ 17. Such a determination is rare, arising only in exceptional cases where the evidence presented at trial weighs heavily against the jury's verdict. *State v. Nkoyi*, 2024-Ohio-3144, ¶ 41 (12th Dist.). "This may occur only when there is unanimous disagreement with the jury's verdict." *State v. Palma*, 2025-Ohio-1318, ¶ 9 (12th Dist.).

{¶ 45} Upon review, and when applying the manifest weight of the evidence

- 18 -

standard to the case at bar, the State has clearly met its burden of persuasion. As noted above, Mills claims that Aldridge's failure to immediately identify him as his attacker raises serious questions about Aldridge's overall credibility, particularly regarding Aldridge's subsequent identification of him as the culprit, given that Aldridge had told "two completely different stories" about what had happened, only one of which included Mills. At trial, however, Aldridge specifically testified that he had not immediately identified Mills as his attacker to the police because he was "freaked out" and unsure of what to do given that he did not want to get his longtime close friend, Mills, in trouble. Aldridge similarly testified that he had not initially identified Mills as his attacker to the doctors treating him for his injuries because he was "still scared" and "worried about getting [his] friend in trouble."

{¶ 46} The jury, upon hearing Aldridge's testimony, determined that Aldridge's identification of Mills as his attacker was trustworthy and deserving of belief. This was well within the jury's purview as the trier of fact and the ultimate factfinder, *State v. Eads*, 2025-Ohio-2815, ¶ 10, for it is well established that "the decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Bedsole*, 2022-Ohio-3693, ¶ 35 (12th Dist.). "[A] verdict is not against the manifest weight of the evidence simply because the jury believed the State's witnesses." *State v. Harsha*, 2025-Ohio-4611, ¶ 20 (4th Dist.). "The determination that a verdict is not against the manifest weight necessarily includes a finding that the conviction was supported by sufficient evidence." *State v. Archie*, 2025-Ohio-5577, ¶ 35 (11th Dist.). Therefore, because the jury's verdict was supported by sufficient evidence and not against the manifest weight of the evidence, Mills's fourth assignment of error is similarly overruled.

## Conclusion

{¶ 47} For the reasons outlined above, and having now overruled Mills's four

assigned errors, Mills's appeal of his conviction following a jury verdict finding him guilty of one count of attempted murder and two counts of felonious assault is denied.

{¶ 48} Judgment affirmed.

M. POWELL and SIEBERT, JJ., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clermont County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

*/s/ Robin N. Piper, Presiding Judge*

*/s/ Mike Powell, Judge*

*/s/ Melena S. Siebert, Judge*